No. 102,921

AMIR FRIEDMAN, M.D., *Appellant*, v. KANSAS STATE BOARD OF
HEALING ARTS, *Appellee*.
(294 P.3d 287)

Opinion filed February 15, 2013.

*Jeffrey A. Bullins*, of Holbrook & Osborn, P.A., of Overland Park, argued the cause, and *Amir Friedman, M.D.*, was on the briefs appellant pro se.

*Zachary J.C. Anshutz*, associate general counsel, Kansas State Board of Healing Arts, argued the cause, and *Wm. Scott Hesse*, general counsel, of the same office, was on the brief for appellee.

The opinion of the court was delivered by

*Per Curiam*: In this appeal, Dr. Amir Friedman asks us to reverse an order of the Kansas State Board of Healing Arts (Board) in which the Board revoked his license to practice medicine and surgery in the state of Kansas. Friedman presents several issues, including a threshold question of whether the Board had jurisdiction to initiate a revocation proceeding after Friedman's license expired. On this threshold issue, we hold the Board had jurisdiction to revoke Friedman's license to practice medicine and surgery because Friedman was practicing medicine under the authority of a license issued by the Board when he committed the misconduct at issue in the revocation proceeding. We also reject Friedman's other arguments, concluding he effectively abandoned a due process argument by failing to adequately brief it and he failed to establish a lack of substantial evidence to support the administrative hearing officer's initial order and the Board's final order. We, therefore, affirm the Board's order and the district court's decision upholding that order.

## PROCEDURAL BACKGROUND

In 1999, the Board issued a medical license to Friedman. For several years, Friedman paid the fees for the annual renewal of his license. Then, in March 2006, Friedman requested that the Board change his license designation to inactive status, and he did not pay the annual registration fee that was due by June 30, 2006.

On July 31, 2006, the Board filed a formal disciplinary action against Friedman that resulted in an order of the Board revoking his license. In its petition, the Board alleged Friedman was a licensee of the Board who committed acts in violation of K.S.A. 65-2836 and K.S.A. 65-2837 "while engaged in a regulated profession as a medical doctor in the State of Kansas pursuant to K.S.A. 65-2801 *et seq.*"

Friedman responded to the Board's petition by seeking dismissal of the action for lack of subject matter jurisdiction. In his motion to dismiss, Friedman argued the Board could not initiate the action against him because his license was expired on the date the petition was filed.

An administrative hearing officer, who is referred to throughout the record as the presiding officer, denied Friedman's motion. Friedman appealed that decision to the district court, and the district court dismissed the appeal because Friedman had failed to exhaust his administrative remedies. The district court's decision was affirmed by this court on appeal in *Friedman v. Kansas State Bd. of Healing Arts*, 287 Kan. 749, 755, 199 P.3d 781 (2009) (*Friedman I*).

While that appeal was pending, the administrative action continued. In an amended petition, the Board alleged five counts of misconduct that arose from Friedman's care of patients. These allegations included claims that Friedman falsified medical records. In a sixth count, the Board alleged Friedman surrendered hospital medical privileges while under investigation. After discovery, the presiding officer conducted an evidentiary hearing regarding the Board's allegations. Subsequently, the presiding officer issued an order in which he found that the Board had established the alleged violations and that Friedman's license should be revoked.

Friedman then petitioned the Board for review of the presiding officer's initial order, and the Board granted the request. After a date for the review hearing was set, Friedman requested a continuance because he did not have a physician who could provide coverage for his patients. The Board denied the motion to continue but did allow Friedman to participate by telephone. Friedman alleges that he was called away from the hearing before he presented his oral argument and "the Board agreed that it would reschedule the hearing to provide for oral argument yet never did so."

On October 14, 2008, the Board issued a final order in which it stated in part that based on the "agency record before it, and after hearing the arguments of the respondent *pro se* as well as counsel for the Board, the Board adopts the findings of fact, conclusions of law and order as stated in the Initial Order." The Board agreed that Friedman's license to practice medicine should be revoked.

Friedman filed a petition in district court seeking judicial review of the Board's order. Following proceedings in district court, the court affirmed the Board's order, and Friedman appealed to the Court of Appeals. His appeal was transferred to this court pursuant to K.S.A. 20-3018(c).

As a result of Friedman's appeal, we will consider the merits of the issue not reached in *Friedman I*: Did the Board have jurisdiction to discipline Friedman given that he was not licensed in Kansas at the time the disciplinary petition was filed? Next, we consider another overarching issue: Did the Board violate Friedman's right to due process? Finally, we will discuss the evidence presented regarding each count of the disciplinary petition, the presiding officer's and the Board's findings of fact and conclusions of law regarding those allegations, and the district court's analysis of the Board's order as we discuss Friedman's arguments that there was not substantial evidence to support the presiding officer's and the Board's orders.

## JURISDICTION

The first of these issues is whether the Board had jurisdiction to initiate the current disciplinary proceeding against Friedman on July 31, 2006. Friedman contends it did not because his license

expired on June 30, 2006. The Board acknowledges that Friedman's license was not active at the time the disciplinary petition was filed but asserts it still had jurisdiction to revoke Friedman's license. The Board presents several arguments in support of its position, including the one on which we decide the issue, which is that the Board's jurisdiction does not depend on the status of Friedman's license on the date the disciplinary petition was filed but rather on the date or dates of the alleged misconduct.

The parties' arguments on this issue are phrased in terms of subject matter jurisdiction. Our authority to consider whether the Board had subject matter jurisdiction derives from a reading of the Kansas Act for Judicial Review and Civil Enforcement of Agency Actions, K.S.A. 77-601 *et seq.* (KJRA), and the Kansas Healing Arts Act, K.S.A. 65-2801 *et seq.* (Act). The KJRA grants a Kansas court the authority to provide relief from an administrative agency's action if the agency "acted beyond the jurisdiction conferred by any provision of law." K.S.A. 77-621(c)(2). This provision applies here because the Act—the law that Friedman is alleged to have violated and the Board enforced—specifically provides that "[j]udicial review and civil enforcement of any agency action under [the Act] shall be in accordance with the [KJRA]." K.S.A. 2011 Supp. 65-2851a(b); see *Ryser v. State*, 295 Kan. 452, 458, 284 P.3d 337 (2012) (holding the Board's actions under the Act are subject to the KJRA). Further, the Board's order revoking Friedman's license is an agency action falling under K.S.A. 65-2812 (charging the Board with administration of the Act). See K.S.A. 77-602(a) ("'agency' means a state agency"); K.S.A. 77-602(e) (defining "order" to be an "agency action"); K.S.A. 77-602(k) (defining "state agency").

Applying the scope of review provision of the KJRA to the question of whether an agency has exceeded its jurisdiction—in other words, its statutory authority—requires interpretation of the statutes establishing and empowering the agency, which in this case is the Board. *Ryser*, 295 Kan. at 464. The Board's jurisdiction is defined by the Act, and this court interprets the Act de novo just as it does all other statutes. *Ryser*, 295 Kan. at 457, 464; *Friedman I*, 287 Kan. at 751-52.

In *Ryser*, we recently considered whether the Act granted the Board jurisdiction to investigate a Kansas licensed physician's conduct even though the conduct occurred in Missouri. Because the Act did not explicitly answer the question, we applied rules of statutory interpretation to divine the legislative intent. Ultimately, we answered the question by interpreting K.S.A. 2011 Supp. 65-2838(a) and K.S.A. 2011 Supp. 65-2837(e) and determining that the physician was a "licensee" as defined in the Act who was practicing under the Act when the misconduct occurred; hence, we held the Board had jurisdiction to take disciplinary action. *Ryser*, 295 Kan. at 465-68.

While *Ryser* provides us guidance in answering the question raised by Friedman, it does not directly answer the question. Nor does the Act; there is no provision that explicitly addresses whether the Board's jurisdiction depends on the status of a license when a disciplinary action is filed. Consequently, as we did in *Ryser*, we must apply rules of statutory construction to discern the answer from what the Act does say. In explaining those rules, we stated:

"We first attempt to ascertain legislative intent by reading the plain language of the statutes and giving common words their ordinary meanings. *Padron v. Lopez*, 289 Kan. 1089, 1097, 220 P.3d 345 (2009). When a statute is plain and unambiguous, we do not speculate as to the legislative intent behind it and will not read into the statute something not readily found in it. But when the statute's language or text is unclear or ambiguous, we 'employ canons of construction, legislative history, or other background considerations to divine the legislature's intent and construe the statute accordingly. [Citation omitted.]' *Stewart Title of the Midwest v. Reece & Nichols Realtors*, 294 Kan. 553, 564-65, 276 P.3d 188 (2012)." *Ryser*, 295 Kan. at 458.

Also in *Ryser*, because there was an ambiguity that arose from the lack of an explicit answer in the statute, we examined the purpose and policy of the Act and recognized that the State of Kansas has broad authority to regulate the practice of medicine, the Act implements that authority, and the Board administers the Act. *Ryser*, 295 Kan. at 464. In the Act, the Kansas Legislature explained that the ultimate purpose is "that the public shall be properly protected against unprofessional, improper, unauthorized and unqualified practice of the healing arts and from unprofessional con-

duct by persons licensed to practice under this act." K.S.A. 65-2801.

Given this purpose, it is significant that other states, as does Kansas, allow endorsement or reciprocal licensing of health care providers. The Kansas statute, for example, provides that an applicant is "entitled" to an "endorsement" license upon presenting proof that the applicant is duly licensed in another state following passage of an examination that was "at least equal in quality to the examination required in this state" and that the license "has never been limited, suspended or revoked [or] that the licensee has never been censured or had other disciplinary action taken." K.S.A. 65-2833. Hence, a Kansas licensee can obtain a license in another state and, once that license is obtained, allow the Kansas license to expire. Then, if Friedman's interpretation of the Act is correct, the former Kansas licensee could use the fact that the license had been allowed to expire as a shield from disciplinary action and, in doing so, avoid the consequences of misconduct committed before the Kansas license expired. Such an interpretation would be contrary to the purpose of the Act. Friedman disputes the application of this public policy to his case because he asserts there is no showing in the record that he attempted to circumvent the policy. Such a showing is not necessary because, regardless of intent, the purpose of the Act would be to protect the public by disciplining a licensee for misconduct.

Even with this stated policy, however, there must be a provision in the statute that would allow the Board to assert its jurisdiction over Friedman. That provision is K.S.A. 2011 Supp. 65-2838(a), which provides that the Board "shall have jurisdiction of proceedings to take disciplinary action authorized by K.S.A. 65-2836 and amendments thereto against any licensee practicing under [the Act]." The phrase that is significant to the issue before us is "licensee practicing" under the Act. The other term "licensee" is defined in the Act to include "persons issued a license, permit or special permit pursuant to [the Act]." K.S.A. 2011 Supp. 65-2837(e). This definition is worded in the past tense—persons *issued* a license—rather than present tense—persons who *have* a license. Thus, the focus is not on the status of the licensee at the

time of the disciplinary proceeding. Additionally, the term "practicing" in K.S.A. 2011 Supp. 65-2838(a) makes the critical time period the point at which the misconduct occurs.

In light of that language and the Board's power to protect the public, we hold K.S.A. 2011 Supp. 65-2838(a) grants the Board jurisdiction to implement a disciplinary proceeding if the person was a licensee of the Board practicing under the Act at the time of the alleged misconduct. Jurisdiction does not depend on the status of a person's license on the date a disciplinary proceeding is filed.

Applying this holding to this case, it is undisputed that (1) the Board had issued a license to Friedman pursuant to the Act and (2) the acts that gave rise to the disciplinary proceeding in this case occurred while Friedman was a licensee practicing under the Act. Because these two facts are undisputed, we conclude the Board had jurisdiction to initiate the disciplinary proceeding against Friedman and to revoke his license to practice medicine.

## DUE PROCESS

The other overarching issue stated by Friedman in his appellate brief is whether the "Board violated Petitioner's due process rights by denying his opportunity to present his case in its Review Hearing." Even though Friedman stated this issue at the beginning of his brief, he did not separately argue the issue in the body of his brief.

In the Board's brief, it asserts that Friedman waived this issue by not presenting argument or caselaw support for his contention. The Board cites, among other authorities, *McCain Foods USA, Inc. v. Central Processors, Inc.*, 275 Kan. 1, 15, 61 P.3d 68 (2002), in which this court held that " '[w]here the appellant fails to brief an issue, that issue is waived or abandoned.' [Citations omitted.]" Friedman responds to this argument in his reply brief by simply asserting: "Under K.S.A. 77-527(e), Appellant had a due process right to present oral argument to the Board's hearing panel of experts but was not permitted to do so." He asserts that he preserved this issue by stating that he had been called away before he could present his argument, the Board agreed to schedule a time for his

argument, and yet the Board issued its order without giving him the opportunity to complete the hearing.

There are several problems with Friedman's argument. First, the accuracy of Friedman's factual contention is disputed as reflected by the Board's final order, which indicates the Board heard "the arguments of the respondent *pro se."*

Second, Friedman has not cited any factual support for his contention that the Board agreed to schedule subsequent arguments. He merely cites to the point in the record where he made the same assertion before the district court. His assertion caused the district court to consider the argument, but the court rejected the claim and concluded Friedman "was provided more than a meaningful opportunity to be heard throughout the agency proceedings." Our rules of procedure are not as forgiving as was the district judge when he accepted Friedman's assertion. " 'It is well-settled that the burden is on a party to designate a record sufficient to present its points to the appellate court and to establish its claims.' [Citation omitted.]" *Southwestern Bell Tel. Co. v. Beachner Constr. Co.*, 289 Kan. 1262, 1275, 221 P.3d 588 (2009). When facts are necessary to an argument, the record must supply those facts and a party relying on those facts must provide an appellate court with a specific citation to the point in the record where the fact can be verified. See Supreme Court Rule 6.02(a)(4) (2012 Kan. Ct. R. Annot. 39) (appellant's brief must include concise statement of facts material to disposition of appeal and "facts included in the statement must be keyed to the record on appeal by volume and page number;" the appellate court "may presume that a factual statement made without a reference to volume and page number has no support"). Friedman has not met this burden.

Third, even if we were to overlook this factual omission because the district court considered the issue, Friedman fails to present any authority establishing a due process right to present an oral argument. The only citation he provides is K.S.A. 77-527, which outlines the procedure to be followed when an agency reviews an initial order. The portion of that statute regarding oral argument, K.S.A. 77-527(e), states that the agency head *"may* afford each party an opportunity to present oral argument." (Emphasis added.)

This court has stated that the word "may" is usually " 'employed to imply permissive, optional or discretional, and not mandatory action or conduct.' [Citations omitted.]" *State ex rel. Secretary of SRS v. Jackson*, 249 Kan. 635, 642, 822 P.2d 1033 (1991). Friedman offers no appellate argument regarding why a different meaning should be given the word in this context or, more generally, why the provision grants him a due process right to present an oral argument.

Finally, even though Friedman cited several other due process concerns in his arguments to the district court and has sprinkled his appellate arguments with references to evidentiary and discovery rulings that resulted in the exclusion of evidence proffered by Friedman, he has not developed those arguments before us. For example, he does not explain why the rulings were erroneous or why the rulings resulted in a due process violation. A failure to support an argument with pertinent authority or to show why it is sound despite a lack of supporting authority or in the face of contrary authority is akin to failing to brief the issue. Therefore, an argument that is not supported with pertinent authority is deemed waived and abandoned. *Superior Boiler Works, Inc. v. Kimball*, 292 Kan. 885, 889, 259 P.3d 676 (2011); *State v. Berriozabal*, 291 Kan. 568, 594, 243 P.3d 352 (2010). Further, an argument raised incidentally in a brief and not argued therein is also deemed abandoned. *Manhattan Ice & Cold Storage v. City of Manhattan*, 294 Kan. 60, 71, 274 P.3d 609 (2012).

Friedman has failed to support his due process argument with a factual record or legal authority and, as a result, has effectively abandoned this due process issue on appeal. Consequently, his due process argument will not be further considered.

## SUBSTANTIAL EVIDENCE

Finally, Friedman identifies two issues that address the nature of the evidence on which the presiding officer and the Board relied. He contends: (1) "The Presiding Officer's order was biased because it was not based on material and reliable evidence," and (2) "The Board's order was not supported by substantial competent

evidence in light of the record as a whole." After listing these as separate issues, Friedman discusses the two issues together.

In doing so, Friedman cites to only one scope of review provision provided for in the KJRA, K.S.A. 77-621(c)(7). This provision allows a court to grant relief if it is established that the agency's action "is based on a determination of fact, made or implied by the agency, that is not supported by evidence that is substantial when viewed in light of the record as a whole." Friedman's issue relating to the Board's order is phrased in terms that echo this standard of review. As to the other issue regarding the presiding officer's order, Friedman uses the terms "biased" and "material and reliable evidence"—terms that do not echo any of the eight scope of review provisions in K.S.A. 77-621(c). Because of Friedman's failure to identify the scope of review or separately brief the issue, the Board argues that Friedman has also abandoned the issue regarding the presiding officer's order. In his reply brief, Friedman asserts he has argued the issue by discussing the evidence of the case. He further notes:

"An agency's action is 'arbitrary and capricious' if it is unreasonable or 'without foundation in fact.' *Pork Motel, Corp. v. Kansas Dept. of Health and Environment*, 234 Kan. 374, 673 P.2d 1126 (1983). . . . [T]he hearing officer failed to apply the law; relied on contradictory evidence; misrepresented Appellant's letters; capriciously discredited expert witnesses; and disregarded the fact that the Board withheld essential medical records from its own expert witness in order to bolster its own case."

Even with this additional argument, Friedman does not specify which of the scope of review provisions of K.S.A. 77-621(c) he asserts as a basis for appellate review. As we have previously noted,

"Such specification is important because a court reviewing an administrative agency's action may grant relief only if it determines one or more of those provisions is violated. K.S.A. 77-621(c); *cf. Kingsley v. Kansas Dept. of Revenue*, 288 Kan. 390, 406-07, 204 P.3d 562 (2009) ('it is a better practice for the language in the petition for judicial review to mirror the statutory basis for the specific relief requested.'); *Pittsburg State University v. Kansas Bd. of Regents*, 30 Kan. App. 2d 37, 45, 36 P.3d 853 (2001), *rev. denied* 273 Kan. 1036 (2002) ('specificity in pleading under the KJRA is necessary to give focus to the asserted agency error and to give the reviewing court a proper understanding of the type of relief

sought')." *Frick Farm Properties v. Kansas Dept. of Agriculture,* 289 Kan. 690, 697, 216 P.3d 170 (2009).

The lack of specification is particularly problematic in this case because Friedman's arguments could fall into multiple provisions of K.S.A. 77-621(c). Friedman's use of the phrase "arbitrary and capricious" in his reply brief appears to invoke K.S.A. 77-621(c)(8), which allows a court to grant relief if the agency action is "unreasonable, arbitrary or capricious." This court has recognized that this provision "can cover a number of things." *Blue Cross & Blue Shield of Kansas, Inc. v. Praeger,* 276 Kan. 232, 275, 75 P.3d 226 (2003) *(Blue Cross).* Sorting through the various possibilities, in *Blue Cross* we determined an argument that findings are arbitrary and capricious because they are unreasonable and without foundation in fact should be analyzed under the standard stated in K.S.A. 77-621(c)(7) because the gravamen of such an issue is whether the evidence is substantial. *Blue Cross,* 276 Kan. at 275. Similarly, in this case Friedman's arguments address the weight and credit to be given the evidence, which is essentially the same argument as would be brought under the substantial evidence standard of review in K.S.A. 77-621(c)(7). Plus, the Board adopted the presiding officer's findings, meaning the analysis of one order is an analysis of the other. Consequently, we will examine whether the findings of both the Board and the presiding officer are supported by evidence that is substantial when viewed in light of the record as a whole.

In citing to the substantial evidence standard in K.S.A. 77-621(c)(7), Friedman and the Board rely on a version of the statute that was adopted after the Board's final order revoking Friedman's license. At the time of the Board's final order in October 2008, K.S.A. 77-621(c)(7) required review of the agency's determination for evidence "that is substantial when viewed in light of the record as a whole." Utilizing this standard, an agency's decision is upheld if there is substantial evidence that supports the agency's finding. This is true even if the record contains evidence supporting contrary findings. *Redd v. Kansas Truck Center,* 291 Kan. 176, 183-84, 239 P.3d 66 (2010).

A different standard was adopted by the Kansas Legislature after the Board's order was filed in this case. L. 2009, ch. 109, sec. 28. Through these amendments, which were effective July 1, 2009, the KJRA requires a court to review all evidence supporting and contradicting the Board's findings, the administrative hearing officer's credibility determinations, and the agency's explanation of why the evidence supports its findings. *Redd,* 291 Kan. at 182.

Friedman seeks application of this new standard, particularly focusing on the requirement that we consider evidence contrary to the presiding officer's and the Board's findings. This new standard does not apply in this case, however, because we have held that the 2009 amendments do not apply retroactively. Rather, the amendments only apply in those cases where the agency's action became final after July 1, 2009, when the amendments took effect. *Redd,* 291 Kan. at 183. Therefore, Friedman's request for review of the Board's October 2008 order must be evaluated under the former statutory standard of whether a determination of fact is supported by evidence that is substantial when viewed in light of the record as a whole. This statutorily defined standard of review applies to both the district court's and this court's review of the Board's action. See *Frick Farm Properties,* 289 Kan. at 697. Friedman, as the party asserting the invalidity of the Board's order, bears the burden of establishing that the order is invalid. K.S.A. 77-621(a)(1) ("The burden of proving the invalidity of agency action is on the party asserting invalidity."); *Frick Farm Properties,* 289 Kan. at 704.

In past decisions, we have explained the substantial evidence standard of the version of K.S.A. 77-621(c)(7) that was in effect prior to July 1, 2009, by stating:

"Substantial competent evidence possesses both relevance and substance and provides a substantial basis of fact from which the issues can be reasonably determined. [Citation omitted.] An appellate court views all the evidence in a light most favorable to the prevailing party, and it does not reweigh competing evidence or assess the credibility of witnesses. [Citation omitted.] This court must accept all evidence and inferences that support or tend to support the findings as true, and this court must disregard all conflicting evidence. [Citations omitted.]" *Frick Farm Properties,* 289 Kan. at 709-10.

Contrary to this standard of review, Friedman essentially asks us to focus on the evidence that conflicts with the Board's findings rather than on the evidence that tends to support the findings. Further, he asks us to reweigh and discredit the Board's evidence even though we are prohibited from doing so under our standard of review. This is especially critical in this case because the presiding officer explicitly found much of the evidence on which Friedman relies, including large portions of Friedman's own statements, to lack credibility.

Applying our standard of review reveals substantial evidence to support the presiding officer's and the Board's findings, although the evidence supporting the Board's findings is disputed. This conclusion is more fully explained by a review of the evidence as to each of the six counts alleged in the amended disciplinary petition.

*Count I*

Count I relates to Friedman's care of an obstetrical patient, who we will refer to as Patient I. In the amended petition, the Board alleged that Friedman had a physician-patient relationship with Patient I and had provided patient care to her throughout her pregnancy. Patient I came to Coffeyville Regional Medical Center (CRMC) at approximately 2 a.m. on July 9, 2004, in active labor.

In the amended petition, the Board alleged that when Patient I came to the hospital Friedman was in Tulsa, Oklahoma, and had not provided CRMC with the name of a covering physician. The Board also alleged that Friedman arrived at CRMC after the baby was delivered, but Friedman's "subsequent documentation in Patient [I]'s CRMC medical record indicates that he was present for the delivery of Patient [I]'s baby, when in fact he was not present." These actions, according to the Board, violated K.S.A. 65-2836(b), which provides in part:

"A licensee's license may be revoked . . . upon a finding of the existence of any of the following grounds:

. . . .

"(b)The licensee has committed an act of unprofessional or dishonorable conduct or professional incompetency, except that the board may take appropriate disciplinary action or enter into a non-disciplinary resolution when a licensee has engaged in any conduct or professional practice on a single occasion that, if con-

tinued, would reasonably be expected to constitute an inability to practice the healing arts with reasonable skill and safety to patients or unprofessional conduct as defined in K.S.A. 65-2837, and amendments thereto." K.S.A. 2011 Supp. 65-2836(b).

The Board cited to five paragraphs of K.S.A. 65-2837 as the basis for the claim of professional incompetency and unprofessional conduct. Those provisions state:

"(a) 'Professional incompetency' means:
. . . .
(2) Repeated instances involving failure to adhere to the applicable standard of care to a degree which constitutes ordinary negligence, as determined by the board.
(3) A pattern of practice or other behavior which demonstrates a manifest incapacity or incompetence to practice the healing arts.
"(b) 'Unprofessional conduct' means:
. . . .
(17) The use of any false, fraudulent or deceptive statement in any document connected with the practice of the healing arts including the intentional falsifying or fraudulent altering of a patient or medical care facility record.
. . . .
(24) Repeated failure to practice healing arts with that level of care, skill and treatment which is recognized by a reasonably prudent similar practitioner as being acceptable under similar conditions and circumstances.
(25) Failure to keep written medical records which accurately describe the services rendered to the patient, including patient histories, pertinent findings, examination results and test results." K.S.A. 2011 Supp. 65-2837.

To prove the claims, the Board called fact witnesses—nurses and physicians—to explain what happened after Patient I's arrival at CRMC. The Board also presented expert testimony regarding the standard of care from Jonathan Daniels, M.D., who is certified by the American Board of Obstetrics and Gynecology.

Friedman defended the claims regarding Patient I by asserting that he maintained staff privileges at CRMC as a courtesy staff member rather than as an active member of the medical staff and did so because he lived in Independence, Kansas, which is 47 minutes from CRMC. According to Friedman, under CRMC's by-laws and the federal Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. § 1395dd (2006), and accompanying regulations, CRMC was obligated to provide physician

care for his patients because he lived more than 30 minutes from the hospital. He asserted that at the time he applied for courtesy staff privileges, he designated Dr. Stephen Miller as his active staff designee to provide "standing coverage." Because of these circumstances, Friedman contended he could not be held responsible for any adverse outcomes related to a delay in treatment because CRMC should have called an active staff member to care for Patient I. He, however, did not present an expert to counter the expert opinion testimony presented by the Board that Friedman failed to meet the applicable standard of care.

As to Patient I, the Board found:

"1. The Respondent provided obstetric services to Patient No. I. On July 8, 2004, the Respondent called Coffeyville Regional Medical Center (CRMC) in Coffeyville, Kansas, to advise that Patient No. 1 would be admitted for an induction on July 9, 2004.

"2. At the time the Respondent called CRMC to inform them that Patient No. I would be seen for an induction on July 9, 2004, he advised that he was in Tulsa, Oklahoma, and he provided some Tulsa phone numbers to CRMC. . . .

"3. In the early morning hours of July 9, 2004, Patient No. I presented herself at CRMC. Patient No. I was in labor and the Respondent was contacted.

"4. The Respondent immediately began driving toward Coffeyville, Kansas, and attempted to manage the care of Patient No. I via cell phone.

"5. During Patient No. I's labor, the nursing staff at CRMC had concerns regarding the baby developing signs of fetal distress. Ultimately, another physician was contacted to deliver Patient No. I's baby.

"6. At no time did the Respondent advise CRMC that he was not available for delivery of the baby nor did the Respondent advise CRMC to contact another physician because he was too far away.

"7. The Respondent appeared at CRMC shortly after the other physician delivered the baby.

"8. Dr. Jonathan Daniels testified that the Respondent did not adhere to the applicable standard of care. Dr. Daniels testified that the Respondent attempted to manage the care of Patient No. I via phone and that he should have 'immediately turned her care over to another physician.'

"9. Regarding Respondent's assertion that he only had courtesy privileges at CRMC, Dr. Daniels still was of the opinion that regardless of the courtesy status of the Respondent's privileges, the Respondent did not meet the standard of care because he did not have a specific physician covering for this patient.

"10. The actions of the Respondent also belie his assertion that as a courtesy physician he did not have to have another physician covering him. The actions of the Respondent clearly show that he was the only physician providing medical

care to Patient No. I until it was necessary for CRMC to contact another physician because the Respondent was not available.

"11. Dr. Daniels also testified that the Respondent's medical notes were misleading. The notes indicate that the Respondent was present and providing care to Patient No. I.

### "Conclusions of Law

"1. The action of the Respondent regarding Patient No. I constitutes a failure to adhere to the applicable standard of care. The Respondent's medical records were misleading. Pursuant to K.S.A. 65-2836 and K.S.A. 65-2837, departure from the applicable standard of care constitutes ordinary negligence. The Respondent's medical records were misleading and constitute unprofessional conduct.

"2. The Respondent's arguments that he was never contacted by CRMC and that it was only when he called CRMC that he learned that Patient No. I had been admitted is totally without merit. The Respondent would have the Presiding Officer believe that he was sitting around his residence in Independence, Kansas, during the early morning hours of July 9, 2004, and that he contacted CRMC on a mere whim to see if any of his patients appeared for treatment. This defies logic and is not credible.

"3. The Board has established that the Respondent did not adhere to the applicable standard of care and that his medical records were misleading."

After Friedman appealed the Board's order pursuant to the KJRA, the district court concluded there was substantial evidence to support the Board's findings. The court noted that Friedman's "story regarding Count I was inconsistent with the facts and . . . not always logical." The court concluded that the evidence boiled down to a credibility determination, which the presiding officer had resolved against Friedman. We agree with the district court's determination for several reasons.

First, Friedman does not fully address the Board's rationale for its decision, which was based on two conclusions: (1) Friedman's care deviated from the standard of care and (2) his medical records were misleading. In his appellate brief, Friedman focuses on the first conclusion but does not address the second. Friedman's failure to address the Board's second conclusion means he has abandoned any arguments relating to it. See *Superior Boiler Works*, 292 Kan. at 889; *Berriozabal*, 291 Kan. at 594. We, therefore, accept that Friedman violated K.S.A. 65-2837(b)(25), which provides it is unprofessional conduct to fail "to keep written medical records which accurately describe the services rendered to the patient, including

patient histories, pertinent findings, examination results and test results."

Second, relating to the standard of care rationale, Friedman responds to only one of the two deviations testified to by the Board's expert, Daniels. Daniels' testimony is succinctly summarized in his written report, in which he wrote:

"Although Dr. Friedman was out of town, the nurse was able to contact him by phone. He then began driving to the hospital in the middle of the night. First he made a mistake in not arranging for coverage at Coffeyville before leaving the area. Secondly he used poor judgment in trying to manage the patient by phone while traveling by car. When first contacted by the nurse he should have immediately made arrangements for one of the physicians in town to cover for him until he could get there."

Friedman's appellate arguments largely ignore the second deviation.

Third, as the district court found, Friedman's arguments regarding the focus of his contention—that he was not required to provide notice of coverage—largely devolved into a credibility contest and the presiding officer clearly stated he discredited Friedman's evidence. On this point, Friedman's argument begins with several correct premises: He was a courtesy staff member at CRMC, the bylaws provided for standing coverage for courtesy staff members in certain situations, and the hospital had obligations to follow federal regulations implemented pursuant to the EMTALA. As to the standing coverage premise, the CRMC bylaws address coverage issues for courtesy staff members by stating:

"The Courtesy Medical Staff member shall notify the Administrator of the hospital of his/her choice of a member of the Active Staff who may be called in the event a patient is admitted to the hospital and the Courtesy Medical Staff member *cannot be reached*, or that such patient should need emergency treatment." (Emphasis added.)

From that point, however, the record does not fully support Friedman's argument.

The first bylaw contingency for calling an active staff member arises if the courtesy staff member cannot be reached. The evidence regarding whether this contingency arose was highly disputed. According to the CRMC nurse, she was able to reach Fried-

man, who gave orders. Her testimony establishes that Friedman was actively managing the patient's care as he was driving to the hospital. Friedman argues the nurse's testimony lacks credibility because his cell phone records do not evidence any calls to or from Coffeyville until 4:22 a.m., approximately 2 hours after the patient had been admitted, and that call was initiated by Friedman. The presiding officer considered Friedman's arguments regarding the discrepancy in the cell phone records and the nurse's testimony and concluded that Friedman's version of events was unbelievable and defied logic. The Board and the district court agreed. This conclusion is a reasonable inference based on the evidence presented, including the Board's findings that Friedman had given the hospital contact numbers in Tulsa where he could be reached—meaning his cell phone records were not dispositive—and the nurse's testimony that "in one of the conversations with him regarding the order for the antibiotics . . . he said I'm in Tulsa, I'm on route, or something to that effect, I'm on my way."

As we have discussed, the standard of review that applies in this case does not allow us to reweigh credibility. *Frick Farm Properties*, 289 Kan. at 697. While highly disputed, there is substantial evidence that the nurse was in communication with Friedman.

As to the second bylaw condition—the existence of an emergency—there is some evidence that when the nurse recognized an emergency, another physician, Dr. Miller, assumed the patient's care. Perhaps, as Friedman argues, the nurse should have contacted Miller at an earlier point in time. Nevertheless, the possibility of negligence by the nurse and hospital does not mean that Friedman did not also deviate from the standard of care as Daniels opined.

Friedman did not counter Daniels' expert testimony with his own expert. Instead, in responding to Daniels' opinion that Friedman's actions caused confusion that led to a delay in treatment, Friedman argues he was not responsible for the confusion. He relies on the fact that when he applied for courtesy staff privileges he designated Miller as the active staff member who could be called to cover his patients, and he argues CRMC should have known this. Friedman's designation of Miller is supported by the

record. But the record also reveals confusion regarding whether that coverage was still in effect at the time of Patient I's care. Miller testified he had been designated when Friedman first applied for privileges, but in July 2004 when Patient I was admitted, the arrangement was that he would cover for Friedman if Friedman "would check out and, you know, let me know if he's gone."

Friedman's own statements to the Board's investigator support the inference from Miller's testimony that he was not always on call to cover Friedman's patients. In his initial response letter dated January 20, 2006, Friedman wrote:

"I informed the nurse on L+D that I was out of town, and had signed out for the evening to a covering physician where I am an active member. I informed the nurse that I would drive in, but that during this time, if she could call Dr. [Daniel] Chappell who generally provided coverage for me at Coffeyville. She stated that Dr. Miller was right there, and could cover. Although my relationship with Dr. Miller had been strained, I accepted the coverage without talking to him directly."

He also noted that the patient

"unexpectedly showed up at Coffeyville for delivery. An obstetrician was present on the floor, and the nurse involved with the delivery communicated to me that this obstetrician will cover. If this physician did not want to cover, then he should have stated this to me directly and I would have had Dr. Chappell cover or the patient transferred."

Then in a letter dated August 4, 2006, Friedman wrote that he informed the nurse "he was out of town and that the covering physician had to be called, that I will come post haste but since my travel will take some time, the covering physician Dr. Chappell from that locale was responsible for management."

Given Friedman's changing statements regarding whether Chappell or Miller should have been called, we have no trouble concluding there is substantial evidence supporting Daniels' conclusion that Friedman's actions caused confusion. This testimony substantiates Daniels' expert opinion that Friedman deviated from the standard of care by not making it clear when he was called that the patient's care should be turned over to another physician.

In Friedman's reply brief, he argues this opinion is not "substantial" because Daniels did not take EMTALA regulations, CRMC's bylaws, or hospital policies into account when forming his

opinion. Contrary to this argument, in Daniels' report he acknowledged Friedman's position that he did not have to arrange coverage because of his courtesy status. Daniels concluded Friedman's position was undercut by Friedman's own actions of attempting to manage the patient care from his car. Hence, even if Daniels had not seen the actual language of the bylaw, he was aware of the issue and accounted for Friedman's position in forming his opinion.

In summary, even though Friedman disputes some of the facts relating to Count I, under the appropriate standard of review the Board's findings on this count are supported by evidence that is substantial when viewed in light of the record as a whole.

*Count II*

Count II relates to the care of Patient II, who was admitted to Mercy Hospital in Independence, Kansas, on September 8, 2004, for labor induction on Friedman's orders even though he was performing surgery in another hospital. In the amended petition in the disciplinary proceeding, the Board alleged Friedman violated K.S.A. 65-2836(b) and K.S.A. 65-2637(a)(2), (a)(3), and (b)(24), which are quoted above.

The Board made the following findings regarding Friedman's care of Patient II:

"2. The Respondent ordered a Pitocin induction for Patient No. II who was pregnant at Mercy Hospital. While Patient No. II was induced, the Respondent was performing elective surgery at Wilson County Hospital in Neodesha, Kansas.

"3. The Respondent ordered the induction of Patient No. II at 8:00 a.m. Patty Fienen, a registered nurse, was providing care for Patient No. II during the induction. Ms. Fienen was aware that the Respondent was going to be in surgery, but believed he would be performing surgeries at Mercy Hospital and not at Wilson County Hospital.

"4. During the induction of Patient No. II, the baby experienced deceleration and after contact was made with the Respondent, he ordered a Cesarean Section for Patient No. II.

. . . .

"6. During the course of Patient No. II's treatment, Ms. Fienen learned that the Respondent was performing surgeries not in Mercy Hospital but at Wilson County Hospital. During the course of preparing Patient No. II for surgery, Nurse Fienen was directed to get an ultrasound for the baby's fluid and fetal weight.

"7. There is nothing in the record to indicate that any other physician would be providing medical care for Patient No. II.

"8. Because the Respondent ordered a Cesarean Section, Patient No. II was prepared for that Cesarean Section even though the Respondent was at Wilson County Hospital in Neodesha, Kansas, and not at Mercy Hospital in Independence, Kansas."

On appeal, Friedman focuses on evidence that he had coverage and asserts it was not necessary to have that coverage documented in the medical record. He points out that Dr. Larry Atwood sent a letter to the Board in defense of Friedman and then testified regarding the letter at the hearing. The relevant portion of the letter stated: "I was available to provide coverage for his patient, [Patient II.] Doctor [Soheila] Sohaei was also available to provide [cesarean]-section coverage for me, as this was our usual arrangement when I was covering [obstetrics] for Doctor Friedman." On cross-examination, Atwood clarified that he had agreed to cover that day but he had never been contacted about Patient II.

Friedman's argument misses a distinction made by Daniels in expressing his expert opinion that Friedman deviated from the standard of care. Daniels did not focus on whether there was a physician available to cover but on the delay that would result because Friedman had not assured that coverage would be readily available in case of an emergency. Daniels explained that Patient II's history meant she was "just the kind of patient that will often develop fetal distress and require an emergency Cesarean Section." Because quick action would be required if such an emergency developed, it was, in his opinion, "very poor judgment" to induce labor when Friedman was not "readily available." In his view, Friedman should have been at the hospital or have arranged for another physician to be readily available, as opposed to merely being available to call to come to the hospital. The failure to make these arrangements meant there was "almost certain . . . delay in either getting him back to the hospital or finding another available [physician]." In other words, Atwood's testimony that there had not been communication regarding the patient is consistent with, rather than contradictory to, Daniels' point that Friedman had failed to assure ready availability of a covering physician. The resulting delay was verified by the nurse's testimony.

Friedman disputes the nurse's testimony regarding her lack of knowledge regarding his unavailability. He asserts she was aware of his location before the patient was ready for surgery, phone logs do not support her timeline, other records bring her testimony into question, and the hospital had a notification system for on-call availability of physicians. Much of his argument goes to the credibility of the nurse, and it is not our role to reassess credibility. See *Frick Farm Properties v. Kansas Dept. of Agriculture*, 289 Kan. 690, 697, 216 P.3d 170 (2009). The nurse's testimony provides substantial evidence of the Board's factual conclusions regarding the events.

Friedman's other arguments seek to undercut the weight of Daniels' opinion, and essentially suggest that the opinion did not account for the custom and practice of a rural hospital. Nevertheless, Friedman did not present contradictory opinion testimony and, as we have discussed, Daniels' concern for delay was valid in light of the nurse's testimony that delay occurred because she was not aware that Friedman was at a different hospital. Hence, there was evidence the surgery was delayed because of Friedman's actions. Accepting all evidence and inferences that support or tend to support the Board's findings, we conclude there is substantial evidence to support the Board's findings regarding Count II.

*Count III*

On October 2, 2005, Patient III presented at Mercy Hospital at 20 weeks pregnant with complaints of bleeding and leaking amniotic fluid. A nurse tended to the patient. While at the hospital, Patient III received several tests and an ultrasound was also ordered. All tests were ordered by Friedman over the phone.

The on-call hospital sonogram technician refused to come in to perform an ultrasound on Patient III, reasoning that at 20 weeks the fetus was not viable and thus, Patient III did not meet hospital protocol for an on-call procedure. Friedman then spoke with Patient III by phone about her options and ordered that she be discharged home. Friedman told Patient III he could not do anything until after 6 p.m. because of Rosh Hashanah, but that she could come to his office at that time. He also recommended that she go

to Wesley Medical Center in Wichita, Kansas, where they could perform the ultrasound. The nurse who treated Patient III testified that all of Friedman's treatment orders were made over the phone and that Friedman did not see Patient III during her stay at Mercy.

In the Board's amended petition, it alleged that Friedman documented a note in Patient III's medical record so that it appeared Friedman was present and examined the patient when he had not. The Board also alleged the failure to examine the patient deviated from the standard of care. These actions, the Board alleged, violated K.S.A. 65-2836(b), K.S.A. 65-2837(a)(2), K.S.A. 65-2837(a)(3), K.S.A. 65-2837(b)(17), K.S.A. 65-2837(b)(24), and K.S.A. 65-2837(b)(25), all of which are quoted above.

Hence, in large part, the allegations regarding Friedman's care of Patient III focused on whether he actually examined the patient. At the hearing, this fact was disputed. Patient III testified that Friedman *did* perform an examination on her that day. The patient testified that she wrote a letter to that effect. However, this evidence is contrary to the medical records and the nurse's testimony. In addition, the patient's testimony is contrary to Friedman's own written words in response to the Board's investigation of the case in which he repeatedly acknowledged he did not come in to examine the patient that day.

Daniels, the Board's expert, starting with the premise that Friedman did not actually examine Patient III, opined that Friedman's treatment of Patient III fell below the applicable standard of care. Daniels reasoned that Friedman should have come in to perform a sterile speculum examination to establish a diagnosis. He disagreed with Friedman's contention that an ultrasound was the best diagnostic tool citing the American College of Obstetricians and Gynecologists (ACOG) Practice Bulletin on Premature Rupture of Membranes.

The Board made the following findings of fact:

"1. The action of the Respondent regarding Patient No. III constitutes a failure to adhere to the applicable standard of care and the medical records were misleading. Pursuant to K.S.A. 65-2836 and K.S.A. 65-2837, the Respondent's departure from the applicable standard of care constitutes ordinary negligence. The

Respondent's note made 19 days following the patient's admission was unprofessional conduct.

"2. The Respondent and Patient No. III both testified at the hearing of this matter. Both alleged that the Respondent did come to Mercy Hospital to examine Patient No. III. This testimony of the Respondent and Patient No. III flies in the face of Exhibit No. 18A, which is a letter from the Respondent to the Board's inspector. In this letter, the Respondent deals with the care of Patient No. III on the day in question. In this letter, Respondent writes:

'My not coming in did not result in physical injury to the patient or her fetus.'

"3. Similarly, in Exhibit No. 21, which is Mercy Hospital's review of the care of Patient No. III, the Respondent writes:

'The patient left upset because a sonogram could not be obtained. She wrote me a letter complaining of this, and I recommended the MEC ask the patient for a copy of this letter. I also suggest the MEC clarify the patient's real concern as both the patient and her husband have conveyed to me upon direct questioning that they were not upset that I did not come in.'

"4. Finally, the Respondent alleges that he came to Mercy Hospital to examine a patient. No one saw the Respondent there. It would seem highly unusual that a physician would go to a hospital and see a patient, but not ask the nursing staff or the medical records staff for the patient's chart. Yet, the Respondent alleges that he did so. As stated above, this flies in the face of his written statements to both the Board and to Mercy Hospital regarding his care of Patient No. III."

Once again, Friedman asks us to reweigh this evidence and, in doing so, argues his written statements were taken out of context because they were meant to convey that he did not immediately come to the hospital because of Rosh Hashanah, not that he never examined the patient. Yet, as we have discussed, our standard of review requires us to limit our role to examining whether the Board's findings are supported by substantial evidence. The discrepancy between Patient III's and Friedman's testimony and the rest of the record, including Friedman's more contemporaneous writings, left a credibility determination to be made by the presiding officer, and under our standard of review we do not assess credibility. See *Frick Farm Properties*, 289 Kan. at 709. Accepting all evidence and inferences that support or tend to support the Board's findings, we conclude the findings of the Board regarding Count III are supported by the record.

*Count IV*

Patient IV was a regular patient of Friedman's between 2002 and 2005. She complained repeatedly of irregular vaginal bleeding. During that time, Friedman saw her for multiple appointments where he took samples for cultures, but according to Patient IV did not obtain a pap smear. He continued to treat her with antibiotics and bed rest.

Frustrated, Patient IV decided to see another doctor, Dr. Sohaei. Sohaei immediately obtained a pap smear and, after viewing Patient IV's cervix, referred her to a gynecology oncologist. Patient IV was subsequently diagnosed with stage IV cancer; cancer was found in her cervix, bladder, and lungs. Treatment was unsuccessful, and Patient IV died.

The Board alleged that Friedman's failure to perform pap smears at appropriate intervals and his failure to recognize and diagnose the patient's cervical cancer violated K.S.A. 65-2836(b), K.S.A. 65-2837(a)(2), K.S.A. 65-2837(a)(3), and K.S.A. 65-2837(b)(24). Friedman defended the allegations with testimony from two experts. Dr. William Manion, M.D., Ph.D., who was the Chief of Pathology at Virtua Health, testified that the patient's cancer was a poorly differentiated transitional cell carcinoma of the bladder, not cervical cancer. Dr. Michael Gold, M.D., who was an associate professor of gynecologic oncology at the University of Oklahoma Health Center, testified that Friedman's care met the standards of care for detection of cervical cancer.

The Board made the following findings of fact and conclusions of law:

"2. Patient No. IV was a female patient of the Respondent's. Patient No. IV first saw the Respondent in August of 2002. At that time, Patient No. IV had a pap smear done. However, the results of the 2002 pap smear are not in the patient's chart.

"3. On February 11, 2003, the Respondent performed a pap smear and cultures on Patient No. IV. Patient No. IV was pregnant at the time and on the specimen source it was listed as 'vaginal.' The February 11, 2003, pap smear was negative.

"4. During the course of the Respondent's care and treatment of Patient No. IV, Patient No. IV complained of pain and vaginal bleeding. She also complained of post-coital bleeding.

"5. On July 15, 2004, the Respondent saw Patient No. IV, who complained of post-coital bleeding. This was approximately one and one-half years since the patient's last pap smear. Patient No. IV was seen 15 times by the Respondent from October of 2004 through November of 2005. During each of the visits, Patient No. IV complained of vaginal bleeding and/or vaginal pain or discharge. Patient No. IV was not bleeding from the vagina on February 10, 2005, but no pap smear was done. The last pap smear was approximately two years prior to February 10, 2005.

"6. In December of 2005, Patient No. IV presented to a different physician. Her complaints were of vaginal bleeding and she had lost weight. A pap smear was done and the cervix was examined.

"7. The pathology report that followed the December 2005 pap smear indicated 'high grade squamous intraepithelial lesion encompassing moderate to severe dysplasia.' Patient No. IV was referred to Douglas Horbelt, M.D., in Wichita, Kansas. Dr. Horbelt performed a cervical biopsy as well as a pap smear. Patient No. IV received treatment for cervical cancer, but ultimately treatment was not successful and Patient No. IV is now deceased.

. . . .

### "Conclusions of Law

"1. The action of the Respondent regarding Patient No. IV constitutes a failure to adhere to the applicable standard of care. Pursuant to K.S.A. 65-2836 and K.S.A. 65-2837, the Respondent's departure from the applicable standard of care constitutes ordinary negligence.

"2. While the Respondent presented expert testimony as to Count No. IV from Dr. Manion and Dr. Gold, the effectiveness of the testimony of Dr. Manion and Dr. Gold is diminished. In light of the evidence before the Presiding Officer, it is clear that the Respondent has been less than truthful. (See Count No. II and Count No. III. The fact that the Respondent writes letters acknowledging certain matters and then he comes to this hearing and testifies in direct opposition to the writings casts serious doubt to the Respondent's credibility.) In light of that, what representations the Respondent has made to both Dr. Manion and Dr. Gold must be questioned."

The district court noted the experts' disagreement regarding the type of tumor but concluded it could not substitute its own judgment for that of the presiding officer in determining which of the experts' opinions was entitled to be believed. Friedman argues, however, that the district court erred because the facts do not support the Board's expert opinions. Once again, his arguments fail to acknowledge the correct standard of review.

As noted in the Board's conclusions, resolution of this count came down to a battle of the experts, and Friedman's side of that

battle was weakened by the presiding officer's opinion that statements made by Friedman to his experts lacked credibility. Further, there were other reasons for the presiding officer to accept the view of the Board's experts Daniels and Dr. John Pfeifer. Daniels, testifying for the Board, stated that postcoital bleeding is a well-known symptom of cervical cancer and that failing to do even one pap smear in the 16 pelvic examinations he performed between 2004 and 2005 was far below the standard of care. He noted that Friedman's assertion that he could not do a pap smear because the patient was bleeding during every office visit was contrary to the medical records. Daniels noted:

"It is almost inconceivable that a well trained gynecologist could do 16 pelvic examinations on a patient during more than a year while she was developing stage IV cervical cancer and not notice anything abnormal about her cervix. When she was seen by Dr. Sohaei the tumor was being described as fungating and ulcerated. Dr. Horbelt described it as being 4-5 cm in size. Clearly, Dr. Friedman did not even meet the standard of care to do cervical cancer screening much less recognize the symptoms and abnormal appearance of a developing malignant tumor of the cervix.

. . . .

"In my opinion Dr. Friedman should have arrived at the proper diagnosis when he saw her in July 2004. . . . Failure to follow the proper Pap smear screening recommendations or to recognize an abnormal appearing cervix, resulted in almost an 18 month delay in diagnosis and a much more advanced cancer than it would have been."

Daniels also testified that the review of samples by Friedman's expert Manion was not as accurate as could be determined through alternative and more traditional methods of analysis than the method used by Manion.

Finally, the Board called Pfeifer as a rebuttal witness to Manion's testimony. Pfeifer testified that his review of the samples and the record indicated the type of cancer Patient IV had was cervical cancer. He completed his analysis utilizing a method that Daniels had opined was more accurate than Manion's method.

Friedman argues we should give weight to his experts over those of the Board. He argues several reasons for discounting Pfeifer's opinion and presents several other factual arguments. These arguments establish that there is some support for Friedman's po-

sition, but they do not mean that there is not substantial evidence to support the Board's findings. Again, we must accept all evidence and inferences that support or tend to support the findings as true, and must disregard conflicting evidence. *Frick Farm Properties*, 289 Kan. at 709.

In these arguments, Friedman does discuss what he views as the apparent bias of the presiding officer and asks us to ignore the presiding officer's credibility determinations. Yet, there is support for the presiding officer's credibility determinations in the form of conflicting testimony, records, and Friedman's own statements. More significantly, the hearing officer clearly considered the testimony of Manion and Gold, and their testimony was countered by other qualified experts who presented substantial evidence contrary to Friedman's and his experts' view of the evidence. The Board's experts' opinions presented substantial evidence that Friedman violated the applicable standard of care in his care of Patient IV.

*Count V*

Patient V began seeing Friedman for prenatal care in June 2005. Early in her treatment, a routine blood screen was done. The Board alleged that the screen was positive for anti-C and anti-D antibodies. The laboratory report containing these results notes that the antibodies can cause "hemolytic disease of the newborn." Although the test was allegedly positive for the antibodies, the results were recorded in Friedman's prenatal record of patient care as negative.

Patient V continued seeing Friedman for her prenatal care until he moved. She then went to Dr. Chappell to continue her care. At that time, she informed Chappell that she had not felt the fetus move for 2 days. After Chappell could not find fetal heart tones, Patient V was given two ultrasounds that confirmed the fetus did not survive.

In its amended petition, the Board alleged Friedman deviated from the standard of care when he failed to review the results of the antibody screen or failed to identify abnormal screen results. In response, Friedman argued there was a laboratory report in his

original chart that confirmed negative antibodies but that the chart sent to the Board after he left Kansas omitted the report.

Portions of the Board's conclusions of law are as follows:

"1. The action of the Respondent regarding the care and treatment of Patient No. V constitutes a failure to adhere to the applicable standard of care. Pursuant to K.S.A. 65-2836 and K.S.A. 65-2837, the Respondent's departure from the applicable standard of care constitutes ordinary negligence.

"2. At various times regarding Patient No. V, the Respondent suggested, argued, or otherwise stated that this file had been either tampered with or had been changed. While perhaps that is an interesting theory, it ignores the fact that the lab report was provided back to the Respondent on July 8, 2005. He continued to treat the patient through November of 2005. The Respondent offered nothing to explain why he ignored the lab results."

Before us, Friedman insists the original file would show he correctly read the laboratory results. He argues the Board pieced together his chart from the records of other physicians and the hospital; the hospital would not have allowed the shot if it was contraindicated; nurses, whose testimony was suppressed, would have testified that the test results were negative; and there are multiple reasons that suggest the stillbirth was not caused by his actions. He further contends Daniels' opinions were based on faulty assumptions.

As noted by the Board, however, the record includes an exhibit of 12 pages of Patient V's medical record; all 12 pages show a facsimile machine recording that reads: "Jan. 10, 2006-1:54 PM-Dr. Friedman." This allows the inference that these records were from Friedman's chart. On the third page, which is a preprinted form, there is a section that is formatted in four columns that are labeled "INITIAL LABS," "DATE," "RESULT," "REVIEWER." One of lines under "INITIAL LABS" is preprinted on the form to read, "ANTIBODY SCREEN." Next to "ANTIBODY SCREEN," someone wrote that the test was administered on June 28, 2005, and that the result was "neg." The "REVIEWED" column is blank. Following that page are several LabOne reports, including a report showing a testing date of June 28, 2005. This is the report that indicates Patient V tested positive for anti-C and anti-D antibodies and warns of the potential for hemolytic disease. Hence, even if as

Friedman asserts there is a laboratory record that would verify his account, the record establishes there was also a laboratory record in his chart that shows Patient V tested positive for anti-C and anti-D antibodies on June 28, 2005. Friedman does not explain why he took no action to reconcile allegedly conflicting laboratory results.

Additionally, the Board relies in large part on the testimony and report of Daniels. Daniels noted that the ultimate responsibility for knowledge of the laboratory results rests with Friedman and his failure to properly review Patient V's laboratory results and to treat her appropriately in light of the June test results were deviations from the applicable standard of care. In his written report he concluded: Friedman "failed to review and act on a very important laboratory test result. Had he acted on the results of this test the baby might not have been stillborn."

In response, as with some other counts, Friedman attempts to point blame at others—in this circumstance, his office staff, the hospital and various labs. Once again, however, even if others were negligent, Friedman can also have deviated from the standard of care applicable to him. Because, our standard of review requires us to accept all evidence and inferences that support or tend to support the Board's findings and to disregard conflicting evidence, we conclude there is substantial evidence to support the Board's findings. See *Frick Farm Properties*, 289 Kan. at 709.

*Count VI*

The final disciplinary count against Friedman alleged Friedman surrendered his privileges at CRMC during an ongoing investigation of his conduct in violation of K.S.A. 65-2836(u), which provides:

"A licensee's license may be revoked . . . upon a finding of the existence of any of the following grounds:

. . . .

"(u) The licensee has . . . agreed to a limitation to or restriction of privileges at any medical care facility or has surrendered the licensee's membership on any professional staff or in any professional association or society while under investigation for acts or conduct similar to acts or conduct which would constitute grounds for disciplinary action under this section."

The Board made the following findings of fact and conclusions of law regarding this count:

"2. Prior to April 22, 2005, the Respondent had privileges at CRMC in Coffeyville, Kansas.

"3. During the time in which the Respondent had these privileges, he had been called before the Medical Executive Committee on a number of occasions.

"4. On April 18, 2005, the Credentialing Committee for CRMC met regarding the Respondent's reappointment to the CRMC staff. At that meeting, the committee voted unanimously not to renew the Respondent's staff status and privileges that he had at CRMC. The committee considered various concerns as well as a Level 3 violation in making its decision not to reappoint the Respondent.

"5. A letter was mailed to the Respondent on April 20, 2005, advising him of the committee's decision recommending non-renewal to the Medical Executive Committee. On April 22, 2005, the Respondent sent a letter resigning his privileges at CRMC.

### "Conclusions of Law

"1. By surrendering his privileges at CRMC while under an investigation for various acts and conduct, the Respondent violated K.S.A. 65-2836(u).

"2. The Respondent argues that he was not under any investigation at the time he submitted his resignation. That is not true. It is clear that he was under investigation. Further, it is highly questionable that he was not aware of the fact that he was under investigation since he was notified by letter on April 20, 2005, and his resignation is dated April 22, 2005."

Friedman argues there is no evidence in the record that shows an investigation was ongoing at the time he resigned. Specifically, he states that there was no active investigation against him until 14 months after his resignation.

Contrary to this assertion, Laura Robson, CRMC's quality risk manager, testified at the hearing that there was an ongoing peer review of Friedman at the time he resigned. This is verified by documents in the record.

Significantly, the April 20, 2005, letter informed Friedman that the Bylaws and Credentials Committee's recommendation was only the first stage of the credentialing decision. The letter informed Friedman that the Bylaws and Credentials Committee's recommendation would be reviewed by the Medical Staff Executive Committee on April 25, 2005, and if the Medical Staff Executive Committee concurred in the credentialing committee's recommendation, Friedman had "hearing and appellate review rights

as outlined in the enclosed Medical Staff Bylaws Article VII." In other words, the hospital's investigation into Friedman's application was ongoing at the time of his resignation with at least one and potentially two more steps in the investigating process yet to be completed.

In addition, in Robson's incident report to the Board regarding the medical records of Patient I, Robson wrote that she was given discretion "to start gathering data regarding possible trends in charting issues" when the Medical Staff Executive Committee considered Friedman's care of Patient I at its August 23, 2004, meeting. Then, according to the minutes of the April 18, 2005, Bylaws and Credentials Committee meeting, "[q]uestionable charting practices were discussed" as one of the reasons for the committee's unanimous recommendation that Friedman's privileges not be renewed. This review continued despite Friedman's resignation, and on May 23, 2005, the Medical Staff Executive Committee concluded Friedman falsified Patient I's medical records. That conclusion led to the reporting of the incident to the Board. These documents provide substantial evidence of an ongoing investigation.

Finally, Friedman argues there is no evidence that he was aware of the investigation. The presiding officer, however, pointed to circumstantial evidence arising from the sequence of events—the Bylaws and Credentials Committee made its decision not to allow Friedman credentials on April 18, 2005, and a letter communicating that decision was sent to Friedman on April 20, 2005. Friedman focuses on the fact that his resignation letter was sent before the credentialing committee's recommendation was acted on by the Medical Staff Executive Committee, and his resignation was effective before the Medical Staff Executive Committee took any formal action. Assuming that such knowledge is even necessary, Friedman's argument ignores the inference that can be drawn from the fact that the Bylaws and Credentials Committee had taken negative action that would be submitted to the Medical Staff Executive Committee for final action, and the investigation continued as long as the credentialing action was not final. As this court has often stated, "circumstantial evidence and the logical inferences there-

from can be sufficient to support a conviction of even the most serious crime. [Citations omitted.]" *State v. Herron*, 286 Kan. 959, 967, 189 P.3d 1173 (2008). The same is true in civil review of agency actions.

Affirmed.

MIKE KEELEY, District Judge, assigned.