NOT DESIGNATED FOR PUBLICATION

No. 113,295

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of

V.F. DOB XX/XX/2012 a Female

MEMORANDUM OPINION

Appeal from Wyandotte District Court; DANIEL CAHILL, judge. Opinion filed September 11, 2015. Affirmed.

*Kiann Spradlin*, of Basehor, for appellant.

*Ashley Hutton*, assistant district attorney, *Jerome A. Gorman*, district attorney, for appellee.

Before HILL, P.J., BUSER, J. and WILLIAM R. MOTT, District Judge, assigned.

*Per Curiam*:  M.F., the natural mother (Mother) of V.F., a child born in 2012, appeals the district court's order terminating her parental rights. Having carefully reviewed the parties' briefs, the record on appeal, and the district court's findings, we conclude the district court did not err and, as a result, we affirm the termination of Mother's parental rights to V.F.

FACTUAL AND PROCEDURAL BACKGROUND

On September 28, 2012, the State filed a child in need of care (CINC) petition and application for an order of protective custody in the Wyandotte County District Court on behalf of V.F. The State alleged that Mother was reportedly using marijuana and alcohol while breastfeeding and had been arrested for disorderly conduct involving an altercation

1

with V.F.'s maternal grandparents (Grandparents). The State also alleged that V.F. had been admitted to the University of Kansas Hospital "due to her being lethargic and hard to arouse." The on duty nurse reported that V.F. presented to the hospital with dirty fingernails, hands, ears, and neck. The hospital's "feeding team" was concerned that, given her condition, V.F. would fail to thrive.

The district court found that an emergency existed which threatened the safety of V.F., and the child was likely to sustain harm if not immediately removed from the home. V.F. was placed in the protective custody of the Department for Children and Families (DCF). In its ruling, the district court determined:

> "Reportedly the mother is using alcohol and marijuana and breastfeeding. The mother was arrested 9/27/12 for disorderly conduct and the baby was hospitalized due to feeding concerns. The 5 month old child is ready to be released from the hospital. The mother states she will not return to [Grandparents'] home which has been the stable environment for the child. The mother told the worker she doesn't have stable housing or a plan for the care of the child since she will not be relying on [Grandparents]."

DCF subsequently placed V.F. with her Grandparents.

Shortly thereafter, Mother tested positive for marijuana. On October 11, 2012, Mother stipulated to the truth of the State's allegation that V.F. was a CINC because Mother had "recently smoked THC[, and] [s]he need[ed] court orders to reunify." As a result, the district court adjudicated V.F. a CINC under K.S.A. 2014 Supp. 38-2202(d)(1) and (2), finding clear and convincing evidence that V.F. was "without adequate parental care, control or subsistence," for reasons other than Mother's lack of financial resources, and she was not receiving "the care or control necessary for [her] physical, mental or emotional health."

2

One month later, the district court conducted a disposition hearing and found that V.F.'s reintegration with Mother was a viable option. The district court reaffirmed its initial case plan, which called for Mother to (1) maintain stable and appropriate housing and provide verification; (2) maintain a stable income and provide verification; (3) sign all necessary releases of information; (4) contact the court services officer (CSO) once per month and prior to any address or telephone number change; (5) complete a psychosocial assessment, a substance abuse assessment, and a mental health assessment and follow all recommendations; (6) submit to random, negative urinalysis (UA) tests; (7) participate in parenting classes and provide documentation of attendance; and (8) attend all of V.F.'s medical appointments. The case plan also provided that the Kaw Valley Center (KVC) would supervise Mother's visits with V.F.

Subsequently, the district court held two review hearings. At the first, held on February 7, 2013, the district court added new requirements to the case plan that Mother participate in individual therapy, attend an updated substance abuse assessment, and follow all recommendations of these programs. These requirements were imposed because prior to the hearing Mother tested positive for using cocaine. The district court also found that an Interstate Compact on Placement of Children (ICPC) should be submitted for Mother when appropriate. The district court held its second review hearing on May 23, 2013, and maintained the prior orders with the exception that visitation was to be at the discretion of KVC.

On September 6, 2013—almost 1 year after the filing of the CINC petition—the district court held a permanency hearing to assess the progress made towards achieving the court's permanency plan of reintegration. Although the public and private agencies had made reasonable efforts to assist the family in accomplishing reintegration, Mother had "not progressed in visitation." As a result, the district court found that reintegration "may or may not be a viable goal for [V.F.]" and it set the matter for a termination hearing.

3

Ten days later, the State moved for a finding of unfitness, under K.S.A. 2014 Supp. 38-2269(b)(3), (4), (7), and (8) and K.S.A. 2014 Supp. 38-2269(c)(1), (2), and (3), and sought termination of Mother's parental rights. On January 8, 2014, the district court held the termination hearing but after hearing some evidence, the court rescheduled the matter for March 28, 2014, for additional testimony.

At that later hearing, the district court was advised of the Grandparents' concerns that Mother had a live-in boyfriend and may be engaged in drug use. The district court encouraged Mother to identify any significant others that were involved in her life. Still, the State believed that Mother was "doing fairly well," because she had an appropriate residence, two jobs, unsupervised visitation, and was participating in the Parents as Teachers program. The district court granted the State's request to continue the termination proceeding to allow Mother "further time to comply with orders and progress in the case."

A permanency hearing was held on July 15, 2014. At the conclusion of the hearing, the district court found that while reintegration was still a viable goal, the matter should be scheduled for a termination hearing.

On November 10, 2014—over 2 years after the filing of the CINC petition—the termination hearing commenced. The district court heard testimony from Mother; Jessica Dixon (a case manager at KVC); Joseph Adriano (Mother's former landlord); and Kristen Gardner, (CSO). Both Dixon, who served as V.F.'s case manager at KVC since December 4, 2013, and Gardner, who was assigned to V.F.'s case on February 7, 2013, opined that "[i]n order to achieve timely permanency," it was in V.F.'s best interests to terminate Mother's parental rights. In particular, Dixon and Gardner were concerned about V.F.'s safety and Mother's ability to provide stability for her.

Dixon testified that although Mother had stable income throughout her tenure on V.F.'s case, she characterized Mother's housing situation as unstable:

"To my knowledge, [Mother] was evicted from the residence in Missouri. And when she moved to Kansas, according to the receipt—the payment receipts for rent that she gave me, I only have through March; so I don't know if rent was paid for April, May, June, or July. And then she had moved out of that residence and moved into another place. According to her, it was for reasons because of [Adriano]; but to my knowledge, it was because she was being evicted."

Dixon also testified that she was aware that Mother's ICPC request was denied due to concerns that Mother had an unauthorized roommate. Moreover, Dixon surmised that Mother was evicted from this residence, as "Case.net in Missouri" indicated there was "an order for eviction on December 18th and [Mother] was served on the 19th."

Regarding Mother's first Kansas residence, Dixon explained that Adriano told her he was planning on initiating eviction proceedings against Mother. Adriano testified that he asked Mother to leave the residence because he believed she had an unauthorized male roommate, which was a violation of Mother's lease, and Mother "got behind on the rent." Adriano did not formally file eviction paperwork because Mother left shortly after he asked her to leave.

Dixon was concerned, that R.R. (Boyfriend), who Dixon later confirmed was Mother's significant other, was living with her as an unauthorized roommate. Dixon's concerns continued when Mother moved to her second Kansas dwelling. In fact, after the July 2014, permanency hearing, Dixon and Mother "had a conversation . . . about being honest about whether she had a boyfriend or not." Mother subsequently admitted that she did have a boyfriend, and Dixon told Mother that if her boyfriend was going to be around, KVC needed to complete an assessment and background checks. Mother

5

claimed, however, that Boyfriend "wasn't going to be living in Kansas City for very much longer, and that he'd be moving to California and then maybe to New Mexico."

Despite Mother's assurances, when visits were made to her new residence, V.F. began saying, "'going to see mommy and daddy'" instead of, "'going to see mommy.'" According to Dixon, V.F. had never "said dad or daddy in reference to anyone," and Dixon began to see male clothing and belongings in Mother's home.

On September 9, 2014, Dixon and her supervisor, Tiffany Thompson, had a scheduled visitation with V.F. at Mother's residence. When Dixon, Thompson, and V.F. arrived at Mother's home, Dixon and Thompson knocked on Mother's front door for several minutes before Mother finally came to the door. Dixon and Thompson asked Mother if they could conduct a walk-through, and Mother responded affirmatively. Mother advised there was no one else present in the home. During the walk-through, two prescription pill bottles with Boyfriend's name on them, his debit card, male clothing and shoes were found in Mother's bedroom.

Dixon and Thompson decided to walk-through Mother's basement. Dixon testified:

> "The basement light is broken, so it's dark, and it's an unfinished basement. So we got a—like our iPhone flashlight and asked [Mother] again if there was anyone in the basement. She said no. We used the flashlight—Ms. Thompson went down before me and had the flashlight, and I followed her down. And as she turned around to the bottom of the stairs, she said, 'Oh, my God, there's someone down here,' and then push—started pushing me back up the stairs."

Thompson confronted Mother regarding her lying about the Boyfriend. In response, Mother claimed "she didn't know there was anyone in the home." Later, Mother admitted

6

that Boyfriend "had been in the basement because he knows he's not supposed to be around [V.F.]"

Dixon spoke with Mother about Boyfriend's presence in her home and the fact that his belongings were in her bedroom but Mother told Dixon that Boyfriend did not live with her. Dixon, however, did not believe Mother's story, "I felt as though she was being dishonest about his involvement in her life and also being around [V.F.], whether he was at visits or previously—I—I have a feeling that he wasn't just at that one visit that we happened to walk into."

Mother brought Boyfriend to KVC for an initial assessment and background checks on September 10, 2014. According to Dixon, this assessment revealed:

> "He reported that his permanent address would be in Kansas City, Missouri, but he was currently living in New Mexico with his friend John. If he comes to Kansas City, he reported that he stays with his mom or his sister in Kansas City, . . . He reported that as an adult he had an assault charge that was later dismissed on—it was an assault charge on a security officer which he spent time in jail for. He stated that he's prescribed but not taking any medication, but he sees a therapist for depression at Truman, and has only used alcohol."

Dixon asked Boyfriend to complete paperwork authorizing her to conduct a Missouri background check because he had reported that his permanent address was in Missouri and he had lived in Missouri "the majority of his life." Boyfriend never returned the paperwork. Dixon later developed evidence from social media indicating that Boyfriend did not reside in New Mexico, but was living in Kansas City in October of 2014.

At the termination hearing, Dixon also expressed her concerns regarding possible domestic violence between Mother and Boyfriend. Notably, Dixon noticed that Mother

7

had a black eye that appeared to be healing at a visit in March 2014. Moreover, Dixon testified that Adriano suspected that Mother had been the victim of domestic violence in the home.

In addition to her safety and stability concerns, Dixon noted that Mother's progress "seemed to be consistently . . . slow progressing since the beginning." Mother had failed to take full advantage of the services KVC had to offer, and KVC had to restrict Mother's visitation rights on several occasions. According to Dixon, while Mother claimed that she had completed all of her parenting classes through PACES and UMKC, she only provided verification of a 2-hour parenting course at PACES. Consequently, Dixon offered Parents as Teachers as a substitute for parenting classes and scheduled some sessions for Mother. Dixon indicated, however, that Mother never took the initiative to utilize KVC's services.

At the termination hearing, Mother testified in her own defense. She stated that she had been working for the Kansas City Repertory Theater as the assistant teleservices manager for almost 2 years, working, on average, 20 to 30 hours a week and earning $1,000 per month. Mother also maintained that she supplements her income with freelance work for a local magazine. While Mother provided Gardner with her two most recent paystubs prior to the hearing, she did not provide proof of any other income.

Mother acknowledged that she had lived in three residences during the pendency of the CINC proceedings, but she denied she was ever evicted. With regard to her first residence, Mother explained that she moved from her Missouri home, which she had maintained for about a year, to a residence in Kansas due to the delays with the ICPC process. According to Mother, her first ICPC request was denied because she had an undisclosed roommate for 2 weeks.

As for her second residence, Mother testified that she moved because she had "several issues" with Adriano which led her to file a complaint with the Housing Authority. In contrast to her testimony, however, Dixon testified that Mother did not "have anything bad to say" about Adriano for the first 6 or 7 months of her tenancy. In fact, "[Mother] said that things were fine," and during several of Dixon's visits to the home, Mother claimed that Adriano was fixing things around the home and, based upon the home's appearance, Dixon believed her. Despite her former moves, however, Mother insisted that her current residence would be stable: "[I]t's stable. It's a quiet neighborhood. It's run by a property management company. They are very much by-the-book."

Mother also testified that she was about 8 months pregnant. Notably, Dixon and Gardner testified that Mother did not advise them of her pregnancy. Rather, Dixon discovered Mother was pregnant when she received Mother's medical records. Although Mother started dating Boyfriend, the baby's father, in July 2013, Mother testified that she did not inform KVC of their relationship because it was "none of their business." Mother explained, "He was not living in the home, and it was something we—casually dated. . . . We weren't living together, so it didn't really seem relevant." Moreover, Mother insisted that she and Boyfriend did not live together at any point during their relationship. Mother also denied that any incidents of domestic violence occurred during her relationship with Boyfriend.

According to Mother, KVC scaled back her in-home visitation with V.F. when Dixon and Thompson discovered Boyfriend in her house. According to Mother, Boyfriend lives in New Mexico and the couple mutually agreed to terminate their relationship because Boyfriend did not want to be involved with her custody matter. Mother explained,

9

"Just given the situation, he and I both thought that any involvement with each other would drag out the process of my ultimate goal of having [V.F.] return home. I also didn't really feel like it was appropriate to be involving somebody else in the situation or focusing any of my energy on anything other than that, especially with what I thought, it was coming so close to being over.

. . . .

". . . It just didn't seem appropriate to focus on anything else, because it was just something that we were doing casually, and I did it as something positive to take my mind off of things. And for it to get turned into something that it wasn't or slow any progress down, it wasn't worth it to me.

. . . .

". . . [I]t was being brought up like he was a huge part of my life or in some kind of way a problem. And so we both decided, in sitting down—he was a foster child. He knows the way the whole thing works, and didn't want any part of it, and didn't want to do anything to cause me any more problems. So he graciously stepped aside. It wasn't an easy decision for either of us—

. . . .

"—but at the end of the day, it was about my child."

Mother also testified that although she and Boyfriend terminated their relationship, they planned to co-parent their future child; therefore, Mother acknowledged that Boyfriend would continue to be a part of her life and, should reintegration be successful, V.F.'s life as well. Moreover, Gardner testified that Mother assured her that Boyfriend was going to be involved in the rearing of his future child: "[S]he said that [Boyfriend] was going to be involved. His plan is to come in at Thanksgiving and be here through the end of the year looking for work, and they were going to work that out."

Mother also acknowledged that she was diagnosed with a "slow cycling bipolar" disorder several years prior to the hearing, and although her psychiatrist prescribed "several medications," she no longer used pharmaceuticals because the initial prescriptions she received "almost killed [her]." Mother reported, "I don't feel comfortable taking pharmaceuticals." Although Mother maintained that she uses natural

remedies and treatment through a psychologist in lieu of medication, she conceded that she had not seen a psychologist, other than her 6 court ordered therapy sessions, for 3 or 4 years.

Finally, Mother testified that in May 2014, she was a passenger in a vehicle involved in a car accident. Mother explained that she went home after the accident and took a cab to the hospital the following day. At the hospital, a urine sample was taken but Mother denied consuming any alcohol prior to the accident or during that evening. Mother's medical records from the accident, however, provided contrary information: "Accident occurred 2.5 days ago. Patient reports she was intoxicated at the time of the accident, and the other driver was not insured, and police were not called."

After considering all the testimony, the district court found that V.F's reintegration into Mother's home was no longer a viable option because Mother was unfit to provide proper care and the conditions of her unfitness were unlikely to change in the foreseeable future. As a result, the district concluded it was in V.F.'s best interests to terminate Mother's parental rights under K.S.A. 2014 Supp. 38-2269(b)(7) and (8), and K.S.A. 2014 Supp. 38-2269(c)(3).

Mother filed this timely appeal.

TERMINATION OF MOTHER'S PARENTAL RIGHTS TO V.S.

On appeal, Mother contends that clear and convincing evidence does not support the district court's decision to terminate her parental rights because, "[t]he court based its entire decision on unproven accusations of deceitfulness." The State, on the other hand, urges this court to affirm the district court's order, which it insists was properly supported by clear and convincing evidence.

11

At the outset, we summarize Kansas law relevant to termination of parental rights cases in the district courts. When a child has been adjudicated a CINC, a district court may terminate parental rights when "the court finds by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." K.S.A. 2014 Supp. 38-2269(a). The Revised Kansas Code for Care of Children, K.S.A. 2014 Supp. 38-2201 *et seq.*, lists a number of nonexclusive factors the district court must consider in determining a parent's unfitness. See K.S.A. 2014 Supp. 38-2269(b).

The district court shall also consider a separate list of nonexclusive factors when, as in this case, the child is not in the physical custody of the parent. See K.S.A. 2014 Supp. 38-2269(c). Any one of the factors in K.S.A. 2014 Supp. 38-2269(b) or (c) may, but does not necessarily, establish grounds for terminating a parent's rights. See K.S.A. 2014 Supp. 38-2269(f). Moreover, the district court is not limited only to the statutory factors in making a determination of unfitness. See K.S.A. 2014 Supp. 38-2269(b). Upon making a finding of unfitness of the parent, "the court shall consider whether termination of parental rights as requested in the petition or motion is in the best interests of the child." K.S.A. 2014 Supp. 38-2269(g)(1). In making such a determination, the district court shall give primary consideration to the physical, mental, and emotional needs of the child. K.S.A. 2014 Supp. 38-2269(g)(1).

Next, we synopsize our standards of review in these matters. When reviewing a district court's decision to terminate a parent's rights, an appellate court must "consider whether, after review of all the evidence, viewed in the light most favorable to the State, it is convinced that a rational factfinder could have found it highly probable, *i.e.*, by clear and convincing evidence," that the parent's rights should be terminated. *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008). In this regard, the district court is in the best position to determine the best interests of the children, and an appellate court may not

overturn such a determination without finding an abuse of discretion. *In re K.P.*, 44 Kan. App. 2d 316, 322, 235 P.3d 1255, *rev. denied* 291 Kan. 912 (2010). A judicial action constitutes an abuse of discretion if it is (1) arbitrary, fanciful, or unreasonable, *i.e.*, no reasonable person would have taken the view adopted by the court, (2) guided by an erroneous legal conclusion, or (3) based upon an error of fact. *In re R.S.*, 50 Kan. App. 2d 1105, Syl. ¶ 2, 336 P.3d 903 (2014).

In the present case, the district court relied upon the following statutory factors in determining that Mother was unfit to properly care for V.F.:

- K.S.A. 2014 Supp. 38-2269(c)(3): Mother failed to carry out the reasonable plan approved by the district court toward reintegrating V.F. back into her home.
- K.S.A. 2014 Supp. 38-2269(b)(8): Mother demonstrated a lack of effort on her part to adjust her circumstances, conduct, or conditions to meet V.F.'s needs.

And

- K.S.A. 2014 Supp. 38-2269(b)(7): V.F.'s reintegration failed despite the reasonable efforts made by the appropriate agencies to rehabilitate the family.

Preliminarily, while Mother's appellate brief contains a lengthy and detailed recitation of the testimony from the termination hearing, her argument challenging the propriety of the district court's order of termination simply consists of the following conclusory assertions:

"The court based its entire decision on unproven accusations of deceitfulness on the part of [Mother]. [Citation omitted.] The court allowed the State to present only evidence of speculation on the part of its witnesses to contradict [Mother's] testimony. As such the

13

court abused its discretion when it based its decision solely on [the] uncorroborated testimony showing [Mother] had been deceitful with the court and social workers involved in the case."

The brevity of Mother's argument raises the procedural question of whether this issue is appropriate for appellate review. See *Friedman v. Kansas State Bd. of Healing Arts*, 296 Kan. 636, 645, 294 P.3d 287 (2013) (a point raised incidentally in a brief and not argued therein is also deemed abandoned); *State v. Tague*, 296 Kan. 993, 1001, 298 P.3d 273 (2013) (failure to support a point with pertinent authority or show why it is sound despite a lack of supporting authority or in the face of contrary authority is akin to failing to brief the issue). However, the State does not challenge Mother's brief in this regard and, as a result, we will address the merits.

The crux of Mother's appeal rests with her claim that the district court erred when it determined the testimony of Dixon and Gardner was more credible and compelling than her own. Mother contends the district court's findings were erroneous because it premised its decision upon an improper weighing of the evidence and faulty credibility determinations.

The district court found "the level of deceit by mom is, I dare say, unprecedented in this court." The district court, however, is in the best position to make such determinations and, thus, "an appellate court must not reweigh the evidence, substitute its evaluation of the evidence for that of the district court, or pass upon the credibility of the witnesses." *In re J.D.C.*, 284 Kan. 155, Syl. ¶ 8, 159 P.3d 974 (2007). Moreover, it is noteworthy that even if this court did accept Mother's invitation to reweigh the evidence, it is difficult to find the district court erred in finding that Mother was deceitful when her own attorney conceded this fact in her closing argument: "I think there are times when she does try. There are times, obviously, *when she's not being honest*." (Emphasis added.)

14

Most importantly, despite Mother's assertion to the contrary, clear and convincing evidence undoubtedly supports the district court's findings of unfitness and its conclusion that it was in V.F.'s best interests to terminate parental rights because reintegration was no longer a viable alternative.

While the district court acknowledged the positive steps Mother took towards reintegration and her "almost complete compliance with the court orders," he found that Mother's deception regarding Boyfriend and her constantly changing explanations for her questionable behaviors demonstrated that her home would not be a safe and stable environment for V.F. The evidence fully supports this conclusion, because the testimony of Dixon and Gardner demonstrated that Mother was, in fact, deceptive with respect to Boyfriend's existence and the extent of her relationship with him. As a direct result of this dishonesty, the appropriate agencies charged with assisting in Mother's reintegration were unable to properly assess whether V.F. would be safe and secure in Boyfriend's presence. Dixon testified:

> ". . . I feel like [Mother] was never fully honest, so I don't know where things ever really lie. And it's never—it never feels stable enough or secure enough to send [V.F.] home or to have extended visits there, because something always happens or something occurs to where we hesitate going any further with visits, so we bring them back to the office; or there's a safety concern, and we have to go to supervised visits. So everything has regressed, and then it goes back out to unsupervised and then back again."

Mother's deception is especially troubling because she was fully and repeatedly advised of the importance of telling the truth regarding Boyfriend. Gardner and the district judge both told Mother that such information was indeed relevant to her child's safety. At the hearing on March 28, 2014, the district judge encouraged Mother to identify any romantic partners that were involved in her life: "I can tell you this, . . . if . . . [KVC] decides . . . to roll over to your apartment unannounced, and he's snoring in the back room[,] [t]hat's not going to be good for continuing the progress you've made."

15

In addition to Mother's deception regarding Boyfriend, there were other omissions and inconsistent excuses she provided for her behavior, *e.g.*, her failure to disclose her pregnancy and her denial of being intoxicated at the time of her car accident despite hospital records to the contrary. Mother's history of substance abuse (including marijuana, cocaine, and alcohol) evidenced itself during the reintegration process but her intoxication while driving which occurred a year and half into the process further shows Mother's failure to carry out reintegration and her unwillingness to adjust her lifestyle to meet V.F.'s needs.

Other examples, such as Mother's refusal to treat her bipolar condition, and Gardner's inability to reach Mother by phone from May to August 2013, validated Gardner's opinion: "I have great concerns over [Mother]'s ability to keep [V.F.] safe going forward." As the district court found, court orders "are a means to help a parent overcome the issues that brought their kids into custody. And mom, up until a few hours ago is sticking with the same things that brought this child into custody."

Finally, V.F. had been in state custody for over 2 years and a reasonable person could certainly conclude, as the district judge did, that it was in V.F.'s best interest to terminate Mother's parental rights because Mother's conduct demonstrated that additional time would only serve to further delay V.F.'s ability to obtain permanency. In this regard, we have consistently stated: "[I]n determining whether Mother's conduct was likely to change in the foreseeable future, we are to consider 'foreseeable future . . . from the child's perspective, not the parent['s], as time perception of a child differs from that of an adult.' *In re S.D.*, 41 Kan. App. 2d 780, Syl. ¶ 9, 204 P.3d 1182 (2009); accord *In re D.T.*, 30 Kan. App. 2d 1172, 1174-75, 56 P.3d 840 (2002); see K.S.A. 2013 Supp. 38-2201(b)(4)." *In re R.S.*, 50 Kan. App. 2d 1105, 1117, 336 P.3d 903 (2014).

During the attempted reintegration process, V.F. was a child of tender years who unfortunately had experienced lengthy delays in achieving a permanent home. We find

16

no error in the district judge's determination that "twenty-six months later, I cannot visit upon this child more months of limbo."

In conclusion, after review of all the evidence, viewed in the light most favorable to the State, we are convinced that a rational factfinder could have found it highly probable, by clear and convincing evidence, that termination of Mother's parental rights to V.F. was not only warranted but in V.F.'s best interests. See *In re B.D.-Y.*, 286 Kan. at 705.

Affirmed.