NOT DESIGNATED FOR PUBLICATION

Nos. 117,775
117,776
117,777

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of B.W., L.W., and A.P.,
Minor Children.

MEMORANDUM OPINION

Appeal from Brown District Court; JAMES A. PATTON, judge. Opinion filed February 2, 2018.
Affirmed.

*Kelly J. Fuemmeler*, of Troy, for appellant natural mother.

*Kevin M. Hill*, county attorney, for appellee.

Before GREEN, P.J., MALONE and ATCHESON, JJ.

PER CURIAM:  T.P. appeals the termination of her parental rights over B.W., L.W.,
and A.P., arguing that the trial court erred because insufficient evidence supported its
findings in support of termination. T.P.'s argument, however, fails for two reasons. First,
she has abandoned her argument by not providing any analysis in support of it. Second,
even if she had not abandoned her argument, the record establishes that clear and
convincing evidence supported the termination of her parental rights over B.W., L.W.
and A.P. Accordingly, we affirm the termination of her parental rights.

On January 9, 2012, the State petitioned the court to find B.W.—a seven-year-old
girl, L.W.—a five-year-old boy, and A.P.—a two-year-old boy—children in need of care

1

(CINC), awarding their temporary custody to the State. The State alleged that the children were "without adequate parental care, control, or subsistence," were "without the care or control necessary for [their] physical, mental or emotional health," and had "been physically, mentally or emotionally abused." The State based its allegations, in part, upon the fact that B.W., L.W., and A.P.'s mother, T.P., had left their five-month-old brother, M.S., unattended on her boyfriend's couch while she and her boyfriend slept upstairs on January 2, 2012. M.S. died "most likely from suffocation" while lying on the couch. B.W., L.W., and A.P. were all in the boyfriend's house when M.S. died. The State further noted that the Kansas Department of Social and Rehabilitation Services (SRS), which was reorganized into the Kansas Department for Children and Families (DCF) in July 2012, had previously "confirmed medical neglect of another child."

On January 10, 2012, the trial court concluded that B.W., L.W., and A.P. were CINC based upon the parental neglect evidence surrounding M.S.'s death and the prior confirmed medical neglect. Accordingly, the trial court ordered that the children be placed in the temporary custody of the State. TFI Family Services, a contractor working for SRS, initially provided case management services for T.P. and the children. TFI created a case management plan with the goal of reintegrating B.W., L.W., and A.P. with T.P. Under this plan, T.P. had the following case plan tasks: (1) she would maintain employment; (2) she would maintain appropriate housing; (3) she would complete and follow all "psychological/parenting" recommendations; (4) she would maintain weekly contact with TFI to confirm visits; (5) she would sign all necessary releases; (6) she would submit to random urinalysis testing; and (7) she would complete and follow all therapy recommendations, which included that she attend individual therapy.

Shortly after creating the case management plan, TFI reported that all three children had behavioral issues. Traci Miner-Contreras, the original caseworker assigned to the children's cases, reported that B.W. had "issues of being bossy and defiant in the classroom." Miner-Contreras reported that L.W. and A.P. had behavioral issues requiring

2

medication. Miner-Contreras also reported that A.P. "acted out sexually toward both [L.W.] and [B.W.]"

T.P.'s ability to appropriately respond to L.W.'s and A.P.'s behavioral issues was a common area of concern in TFI's case reports. In a February 2013 case report, Miner-Contreras explained that TFI granted T.P. an extended home visit with the children over Christmas 2012. When L.W. and A.P. returned to their foster home, they told their foster parents that T.P. and her boyfriend had put them "'in the basement with the rats' because they would not behave." According to Miner-Contreras, when confronted with L.W. and A.P.'s statement, T.P. and her boyfriend denied putting L.W. and A.P. in the basement with the rats but admitted that they had threatened L.W. and A.P. that they would put them in the basement with the rats if they did not behave. They explained threatening L.W. and A.P. with the rats "was the only way they could get the boys to listen." Following this incident, TFI required that T.P. complete parenting classes as part of her reintegration case plan tasks.

In August 2013, KVC Behavioral Healthcare began providing case management services for T.P. and the children. T.P.'s case plan tasks for reintegration remained the same as when TFI provided case management services. Moreover, Miner-Contreras continued to work on the case in a supervisory role.

In a progress report compiled for the trial court on February 3, 2014, KVC reported that T.P. had complied with her case plan tasks except for her task of participating in individual therapy. KVC also reported that despite completing the case plan tasks, "there [were] still concerns for the wellbeing [of] the children" as well as how T.P. would transport the children to school. For this reason, KVC recommended that the children "remain in DCF custody with out of home placement." At the February 11, 2014 review hearing, the trial court adopted KVC's recommendation, finding that although reintegration was still the goal, the children should remain in DCF custody with out-of-

3

home placement. The trial court also provided KVC with the discretion where to place the children. Despite making this finding, for reasons not fully clear in the record, KVC allowed L.W. to go home with T.P. that very day. Moreover, all of the children returned to T.P.'s home before KVC compiled its next progress report for the trial court.

In May 2014, KVC reported that the children were "adjusting well to the return to their mother's home" and T.P. was demonstrating appropriate parenting skills. On June 18, 2014, however, DCF removed both L.W. and A.P. from T.P.'s home. KVC reported that L.W. and A.P. had to be hospitalized because they were "making comments about wanting to die and go to heaven to be with their baby brother." In addition to those reported comments, KVC reported that L.W. and A.P. had tied a belt around their necks, resulting in visible markings. KVC reported that based upon the preceding incident, "there were concerns with [T.P.'s] ability to meet the boys['] mental health needs." B.W. remained at home after L.W.'s and A.P.'s removal.

In December 2014, a KVC caseworker reported that T.P.'s visits and contact with KVC had become inconsistent. This caseworker also expressed concerned because B.W. had told her that she and her mother were living at the house of her mother's new boyfriend, Chris Eppens. B.W. explained that they were living at Eppens' house "because they [had] more things at his house, like food."

On June 13, 2015, police responded to a domestic dispute at Eppens' house. When police arrived, T.P. told police that Eppens had chased her around the house before pushing her down onto a bed and hitting her in the head multiple times. Police reported that T.P. had swelling around her left eye and ear. In a written report that T.P. gave to the police, she stated that B.W. was home when Eppens hit her.

On August 24, 2015, T.P attended a meeting at the KVC office where KVC requested that she sign a safety plan which required her to promise not to let any of her

4

children come into contact with Eppens based upon his arrest for domestic battery. The safety plan also prohibited T.P. from leaving any of her children alone with her sister, who had been convicted of possessing methamphetamine. T.P. refused to sign the plan, and the next day DCF removed B.W. from T.P.'s home based upon T.P.'s refusal to sign the safety plan. A couple of weeks later T.P. agreed to sign the safety plan and reported to KVC that she and Eppens were no longer in a relationship. KVC workers questioned T.P.'s statements about not being in a relationship with Eppens, noting that "social media sites show[ed] different[ly]."

Once all the children were in out-of-home placement, although T.P. continued to struggle to attend individual therapy, she consistently attended family therapy. The family therapy was a case plan task that KVC had added in June 2015. For family therapy, T.P. had specifically requested that KVC allow her to attend family therapy with Kaitlyn Meade. KVC's January 2016 progress report described the family therapy sessions as chaotic. In the report, KVC explained that Meade had requested that a KVC employee attend all family therapy sessions because she needed a KVC employee to address L.W.'s and A.P.'s behavioral problems should one become "dysregulated" so the others could continue with the therapy session. KVC employees who attended or helped transport the children to the sessions witnessed L.W. and A.P. become aggressive both verbally and physically, as well as engage in acts of self-harm.

In its April 2016 progress report, KVC recommended that the court find that reintegration with T.P. was no longer a viable goal for B.W., L.W., or A.P. KVC reported that T.P. was not complying with certain case plans. KVC noted that the previous month, staff overheard T.P. "using profanity at the children" while "telling them that the agency [was] lying," that the agency was "trying to split them up," and that their "foster parents [would] never love them." KVC further reported that L.W.'s and A.P.'s behavioral issues had increased when they saw their mother, when they were being transported to see their mother, or when they were being transported from seeing their mother. In a recent visit

between T.P and the children, A.P. began yelling and crying "for two periods of 15-20 minutes each," and L.W. ran out of the KVC office. T.P. was unable to calm A.P. down, and KVC had to call police to find L.W.

Attached to KVC's April 2016 progress report was a letter from Meade. In this letter, Meade stated that T.P. had "tried to parent the children effectively in therapy, but ha[d] a difficult time with the behaviors, and being able to pay attention to all the children." Meade concluded: "There is no doubt [T.P.] loves her children, and they [love] her, but the instability of the children's mental health, the instability of [T.P.'s] mental health, and her ability to parent such challenging behaviors is concerning."

Given KVC's recommendation in its April 2016 progress report, the trial court set the cases for a permanency hearing. The trial court further ordered that T.P. have no contact with the children unless she attended individual therapy. This meant that family therapy stopped. KVC reported that after family therapy stopped, B.W.'s L.W.'s, and A.P.'s behavior had improved, seemingly because T.P. began attending individual therapy. KVC resumed family therapy in August 2016 and Samantha Underwood acted as the family therapist. At that time, KVC also reported that the children's behavioral issues also resumed.

On November 8, 2016, the trial court held the permanency hearing. The trial court found that although reasonable efforts had been made to assist T.P. with reintegration, T.P. was "not adequately addressing [the] mental health needs of [the] children [and] not following through with [the] parental needs of [the] children." It therefore found that reintegration was no longer a viable goal and adoption or permanent custodianship would be in the best interests of the children. Given this finding, T.P. was no longer allowed to have contact with the children.

6

On January 24, 2017, the State moved to terminate T.P.'s parental rights. The State asserted that T.P.'s failure to comply with the case plan tasks established that she was "unfit by reason of conduct or condition that [was] unlikely to change in the foreseeable future." The State particularly emphasized that T.P. had failed to adjust her conduct to address B.W's, L.W.'s, and A.P.'s behavioral issues and mental health needs. T.P.'s attorney did not file a response to the State's motion.

On April 10, 2017, the trial court held a hearing on the State's motion to terminate T.P.'s parental rights. At the hearing, Miner-Contreras was the primary witness for the State. Jessica Hammersmith, the most recent KVC caseworker assigned to the cases, and Michele Petrie, a DCF social worker, also testified on behalf of the State. T.P. was the only person who testified on her behalf.

Miner-Contreras first testified that after DCF initially took B.W., L.W., and A.P. into custody, T.P. complied with the case plan reintegration goals that TFI, and then KVC, created for her. She testified that this is why the children were eventually placed back in the home with T.P. in 2014. She then testified that L.W. and A.P. were able to remain at home with T.P. for only a few months before they attempted "to strangle themselves and die so they could go to heaven and see their baby brother." Miner-Contreras expressed concern over T.P.'s reaction to L.W.'s and A.P.'s apparent suicide attempt. She explained that during L.W.'s and A.P.'s hospitalization, KVC and DCF had to have several meetings about T.P.'s "lack of participation in [L.W.'s and A.P.'s] mental health services while they were in the acute hospital." She explained that T.P. believed that "this was [L.W. and A.P.'s] problem and they needed to deal with it," which resulted in her not participating in conference calls or meetings about the children's mental health.

Next, Miner-Contreras testified about the day she and others at the KVC office attempted to get T.P. to sign the safety plan. Miner-Contreras testified that T.P. had brought B.W. with her to the KVC office that day. She stated that once T.P. became

7

upset, "she attempted to leave the KVC office[,] stating that we could just keep [B.W.]." She explained that T.P. was "literally at the front door" when staff conveyed to her that they would not be keeping B.W. According to Miner-Contreras, it was at this point T.P. told B.W., "Okay [B.W.,] they're not going to take you, go ahead and come with me."

Concerning case plan tasks, Miner-Contreras testified that although T.P. had been diagnosed with a narcissistic personality, T.P. inconsistently attended individual therapy until the court ordered that T.P. attend it after it found that reintegration with the children was no longer a viable goal. She testified that T.P. frequently stated that she did not need individual therapy, and T.P. later stated that she only attended individual therapy to comply with the court order. Miner-Contreras asserted that from what she could tell, T.P. did not believe she needed individual therapy.

For the case plan task of applying skills learned in parenting classes, Miner-Contreras testified that T.P.'s compliance with the task was inconsistent. Miner-Contreras recognized that T.P.'s children's behavioral issues could be "pretty significant." Even so, she explained that T.P.'s responses to their behavior were inappropriate. She testified that when one of the children would have a behavioral outburst, T.P. would often ignore that child. She testified that on the other hand, if T.P. attempted to discipline the child having the behavioral outburst, T.P. spent the entire time attempting to discipline the child without success. Miner-Contreras asserted she believed that T.P. had contributed to the children's behavior issues and "anxiety" by telling the children that KVC was trying to separate the family and did not "care for them." She also provided the example of T.P. and her boyfriend threatening L.W. and A.P. that they would put them in the basement with the rats as inappropriate parenting skills.

Miner-Contreras also testified about how B.W., L.W., and A.P. had made significant improvements since visits with their mother had stopped. She explained that when the children were having consistent contact with their mother, they were having

8

frequent behavioral issues and outbursts. She testified that L.W. and A.P. were having "tantrums almost daily" but have only had about three in the last month. She testified that now the children's therapists recommend that they see them "on an as needed basis" as opposed to a weekly basis. She testified L.W.'s doctors were able to lower the dosages of his medications. Moreover, she explained that all three children were doing well in school with their grades improving. Miner-Contreras further testified that the change in the children since their contact with their mother had stopped was "night and day." Based upon this change and her belief that T.P.'s parenting skills were inadequate, Miner-Contreras testified that T.P.'s parental rights over the children should be terminated.

Although Hammersmith was a State's witness, most of her testimony occurred during cross-examination. During cross-examination, Hammersmith admitted that T.P. was currently in compliance with her case plan tasks. T.P.'s attorney also questioned Hammersmith about whether she agreed with KVC's recommendation to terminate T.P.'s parental rights given Underwood's September 28, 2016 family therapy report, which stated:

> "[T]he family demonstrates a strong bond with one another. Mother shows appropriate affection and reinforces positive behaviors during the sessions. She responds to behavioral issues by reminding the children of limits and potential consequences as set in the beginning of therapy. Mother engages well with children, and they interact in family cohesion activities. All children express [a] strong desire to be with mother."

Hammersmith responded that she believed termination was the correct recommendation based upon "the behaviors of the children before and after therapy" and "[k]owing the life of the case." Hammersmith also emphasized that Underwood had been T.P. and the children's family therapist for less than two months, and Meade, who had been their family therapist for much longer, recommended terminating T.P.'s parental rights.

9

T.P.'s testimony emphasized that she was currently in compliance with all of her case plan tasks. During her testimony, T.P. also stated that her children had mental health issues that need to be addressed. On cross-examination, the State asked T.P. whether she knew that M.S.'s father had been convicted of committing a sex crime against a child during her year-long relationship with him. T.P. denied knowing that M.S.'s father was a sex offender during the relationship, but she admitted that she knew that fact now. T.P., who had been on probation for a forgery conviction when she was dating M.S.'s father, further testified she could not recall being told by her probation officer that she should stay away from M.S.'s father because he was a sex offender. T.P. testified that she was currently aware that B.W., L.W., and A.P.'s father was a convicted sex offender.

When questioned by the State about her own mental health history, T.P. admitted that her mother had committed her to a mental health hospital following a failed suicide attempt when she was a teenager. T.P. also admitted that in addition to B.W., L.W., and A.P., she had two other children whom are currently living with their respective fathers by "mutual agreement." She testified that although she did not consistently see either child, she provided support for both. When asked about Miner-Contreras' testimony about her children's behavioral issues during visitations, like running away, T.P. testified that Miner-Contreras was lying, even though she "ha[d] no idea" why she was lying. Last, T.P. testified that she could not recall a September 2010 SRS investigation where she was cited for lack of supervision. She then testified that SRS had never asked her whether her brother was capable of caring for her children and never denied to DCF that her brother was incapable of caring for her children.

After T.P.'s testimony, the State called Petrie to testify as a rebuttal witness. Petrie testified about the contact that SRS had with T.P. in September 2010. Petrie testified that SRS cited T.P. for lack of supervision over B.W., L.W., and A.P. after T.P. placed the children in the care of her brother for a weekend; SRS confirmed that her brother left the children alone for at least 10 minutes. Petrie testified that SRS interviewed T.P about her

10

decision to leave the children with her brother given that he had mental health issues and had also lost custody of his own children. According to Petrie, T.P. denied that her brother was incapable of caring for her children but acknowledged that her brother's children were in foster care. Petrie further explained that in January 2011, SRS investigated T.P. again because a rat infestation in her house resulted in one of the children being bitten by a rat.

At the conclusion of the hearing, the State and T.P.'s attorney made arguments. T.P. argued that she had adjusted her circumstances and conduct as evidenced by the undisputed fact that she was currently in compliance with her case plan tasks. The trial court took the parties' arguments under advisement. In the end, however, the trial court decided to terminate T.P.'s parental rights.

In support of its findings, the trial court took specific note of the following facts: (1) T.P.'s pre-2012 encounters with SRS; (2) T.P.'s other children not being in her custody; and (3) T.P.'s apathetic response to B.W.'s, L.W.'s, and A.P.'s behavioral issues and mental health needs. The trial court found that T.P. had "given lip service to [the children's] mental health needs, but her actions [were] not truly supportive." It found that T.P. had actually "undermined the mental health process of the children." The court also explicitly made an adverse credibility determination against T.P. based on inconsistency in the evidence, for example, T.P.'s denial that the children had behavioral issues during her visitations with them despite contradictory evidence showing that such behavioral issues existed.

The trial court concluded:

"The mother at the present time [is] in compliance with the case plan, but that does not override the years when she wasn't in compliance, when she didn't do this. The Court has grave concerns and finds in this particular case that because of those concerns

11

she is not going to be able, and was not able to control the children's behavior. They were unruly, defiant, undisciplined, difficult to control, and then we look at what's happened since they were not in her control. Since in foster care in separate homes for most of the time until recently, their grades improved, less bad disruptive behavior, less medication. They've finally been returned to one particular foster home where they all live together.

"Based upon all of those facts by clear and convincing evidence the Court finds that [T.P.] is unfit by reason of conduct. She had five years to correct it and didn't. That renders her unable to care properly for these three children, and this conduct is unlikely to change in the foreseeable future.

"The Court notes that she is in compliance with the plan, but that compliance has nothing to do with those three children being in her home. The Court finds that she's failed to make reasonable efforts by SRS, DCF, KVC to rehabilitate the family. The children have been in extended out of home placement as a result of her actions or inactions, and failure to carry out these reasonable plans.

"Based upon all of that the Court finds it's in the best interest of the children to terminate the parental rights to . . . [B.W., L.W., and A.P.]."

T.P. timely appealed the termination of her parental rights.

*Did the Trial Court Correctly Terminate T.P.'s Parental Rights?*

Appellate courts review the trial court's termination of parental rights to determine whether "after review of all the evidence, viewed in the light most favorable to the State, we are convinced that a rational factfinder could have found it highly probable, *i.e.*, by clear and convincing evidence, that the parent's rights should be terminated." *In re K.W.*, 45 Kan. App. 2d 353, 354, 246 P.3d 1021 (2011). K.S.A. 2016 Supp. 38-2269(a) states that a parent's rights should be terminated only "when the court finds by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." "The foreseeable future is examined from the perspective of a child because children and adults have different perceptions of time

12

and children have a right to permanency within a time frame reasonable to them." *In re M.H.*, 50 Kan. App. 2d 1162, 1170, 337 P.3d 711 (2014). Unfitness, on the other hand, is determined by looking at a nonexhaustive list of factors.

In relevant part, K.S.A. 2016 Supp. 38-2269(b) provides:

"In making a determination of unfitness the court shall consider, but is not limited to, the following, if applicable:

. . . .

"(6) unexplained injury or death of another child or stepchild of the parent or any child in the care of the parent at the time of injury or death;

"(7) failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family;

"(8) lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child; and

"(9) whether the child has been in extended out of home placement as a result of actions or inactions attributable to the parent and one or more of the factors listed in subsection (c) apply."

Subsection (c) lists four factors, including that the court shall consider a parent's "failure to carry out a reasonable plan approved by the court directed toward the integration of the child into a parental home." K.S.A. 2016 Supp. 38-2269(c)(3).

Following a determination that a parent is unfit, "the court shall consider whether termination of parental rights as requested in the petition or motion is in the best interests of the child." K.S.A. 2016 Supp. 38-2269(g)(1). In making the best interests of the child determination, "the court shall give primary consideration to the physical, mental and emotional health of the child. If the physical, mental or emotional needs of the child would best be served by termination of parental rights, the court shall so order." K.S.A. 2016 Supp. 38-2269(g)(1).

13

T.P.'s sole argument on appeal is that "when viewed in the light most favorable to the State, [the evidence] fails to support the findings of the Court." In the facts section of her brief, T.P. points out that when the termination hearing occurred, she was in compliance with all of her case plan tasks. She also points out that in Underwood's September 28, 2016 family therapy report, Underwood stated that she interacted appropriately with her children. In the analysis section of her brief, however, T.P. has merely asserted that termination was not supported by the evidence without providing any additional argument or analysis. It is a rule of this court that a point raised incidentally in a brief and not argued therein is deemed abandoned. *Friedman v. Kansas State Bd. of Healing Arts*, 296 Kan. 636, 645, 294 P.3d 287 (2013). Thus, it is readily apparent that T.P. has abandoned her argument.

Regardless, given that the result of this proceeding is the termination of T.P.'s right to be a parent to B.W., L.W., and A.P., it is important to emphasize that even if T.P. had not abandoned her argument, her argument would still fail because the trial court's decision to terminate her parental rights over B.W., L.W., and A.P. was supported by clear and convincing evidence when viewed in the light most favorable to the State.

To summarize, the trial court terminated T.P.'s parental rights because it concluded that clear and convincing evidence existed that T.P. was unfit by conduct that was unlikely to change in the foreseeable future given the following: (1) because KVC's and DCF's reasonable efforts to reintegrate her with the children had failed as stated under K.S.A. 2016 Supp. 38-2269(b)(7); (2) because T.P.'s actions showed a lack of effort to adjust her conduct to the children's needs as stated under K.S.A. 2016 Supp. 38-2269(b)(8); and (3) because T.P.'s actions and inactions regarding her case plan tasks led to the children being in out-of-home placement for an extended period of time as stated under K.S.A. 2016 Supp. 38-2269(b)(9) and (c)(3). The court found that the children's best interests were served by termination as stated under K.S.A. 2016 Supp. 38-2269(g)(1) based upon the evidence of the children's improved behavior, mental health,

14

and grades after they no longer had visitations and family therapy with their mother. The court also noted T.P.'s prior run-ins with SRS.

Regarding evidence that could support the court's termination of T.P.'s parental rights, there has never been any dispute that TFI and then KVC implemented a case plan with tasks imposed so T.P. could be reintegrated with B.W., L.W., and A.P. It is also an undisputed fact that during the vast majority of the case, T.P. failed to comply with certain case plan tasks. Particularly, T.P. failed to comply with the tasks to attend individual therapy and apply skills she learned in parenting classes. At the termination hearing, Miner-Contreras testified to this fact while also providing examples of poor parenting skills demonstrated by T.P. These examples included the following: that T.P. had threatened to put L.W. and A.P. in the basement with the rats as punishment, that T.P. refused to participate in L.W.'s and A.P.'s mental health treatment, that T.P. initially refused to sign the safety plan, that she told KVC workers they could keep B.W. after refusing to sign the safety plan, and that T.P. was generally unable to discipline the children during her visitations with them. The State also presented evidence about T.P. undermining KVC's efforts to improve the children's mental health and behavior by telling the children that KVC and DCF were lying to them and that they did not care about them.

Moreover, it is an undisputed fact that during the five-plus years the children's CINC cases have been pending, B.W. lived in T.P.'s home for only 17 months, L.W. lived in T.P.'s home for only 4 months, and A.P. lived in T.P.'s home for only 3 months. Given their ages when they entered DCF custody, this means that B.W. has spent about a third of her life in out-of-home placement, L.W. has spent about half of his life in out-of-home placement, and A.P. has spent about two-thirds of his life in out-of-home placement. Of significance, B.W.'s removal from T.P.'s custody the second time was a direct consequence of T.P.'s decision not to sign the safety plan prohibiting her children from coming in contact with Eppens.

15

Regarding B.W.'s, L.W.'s, and A.P.'s best interests, although T.P. testified that she could not recall SRS investigating her in September 2010, Petrie's testimony established that T.P. had been investigated by DCF more than once before M.S.'s death in January 2012. Moreover, Miner-Contreras testified that the behavior, mental health, and grades of B.W., L.W., and A.P. had all improved significantly after family therapy and visitations with their mother had stopped.

When one considers the preceding evidence in the light most favorable to the State, it is readily apparent that T.P.'s children have special behavioral and special mental health needs, but the evidence shows that T.P. was either incapable or unwilling to adjust her behavior to adequately address her children's special needs. Her failure to comply with case plan tasks designed to reintegrate her with her children resulted in the children being out of custody for an extended time and also resulted in the failure of KVC's and DCF's reasonable efforts to reintegrate her with her children. Additionally, it is an undisputed fact that once contact with T.P. stopped, all three children improved behaviorally, mentally, and academically.

Therefore, the trial court's unfitness findings under K.S.A. 2016 Supp. 38-2269(b)(7)-(9) and (c)(3) and best interests of the children findings under K.S.A. 2016 Supp. 38-2269(g)(1) were supported by clear and convincing evidence. In turn, when considering the evidence in the light most favorable to the State, clear and convincing evidence supported the trial court's decision to terminate T.P.'s parental rights over B.W., L.W., and A.P. Consequently, we affirm the termination of T.P.'s parental rights to B.W., L.W., and A.P.

Affirmed.