NOT DESIGNATED FOR PUBLICATION

Nos. 119,786
119,787

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of N.S. and O.S.,
Minor Children.

MEMORANDUM OPINION

Appeal from Leavenworth District Court; MICHAEL D. GIBBENS, judge. Opinion filed March 1, 2019. Affirmed.

*Charles Joseph Osborn*, of Osborn Law Office, LLC, of Leavenworth, for appellant natural mother.

*Meredith D. Mazza*, assistant county attorney, and *Todd Thompson*, county attorney, for appellee.

Before ARNOLD-BURGER, C.J., GREEN and HILL, JJ.

PER CURIAM: Mother appeals the appointment of permanent custodians for her children O.S. and N.S. Mother argues that evidence did not support the trial court's findings that she was unfit and likely to remain unfit in the foreseeable future. For the reasons stated below, we affirm.

S.K. ("Mother") is the mother of O.S., born 2002, and N.S., born 2005. The children's father died in 2013.

On August 3, 2016, O.S. and N.S.'s paternal grandmother and paternal great uncle contacted DCF. At the time, O.S. was 14 years old and N.S. was 11 years old. Amie Fleury, a DCF social worker, was assigned to the case.

Fleury interviewed O.S. and N.S., as well as their paternal grandmother and paternal great uncle. N.S. was staying with the paternal grandparents and O.S. was staying with the paternal great uncle; the paternal grandparents and paternal great uncle live next door to each other. The paternal grandparents are also raising O.S. and N.S.'s half-sister.

The relatives told Fleury that Mother had dropped the children off at their homes in July 2016 because Mother was homeless and "bouncing around" between residences. Before being dropped off with paternal relatives, the children had been living at different friends' houses since the beginning of June 2016. O.S. and N.S. reported that prior to being dropped off at their paternal relatives' homes, they frequently moved from place to place, including a stint where Mother, Mother's boyfriend, and the children all lived in one room. When the children arrived at the paternal relatives' homes, they had one change of clothes each, and N.S. had a bad case of head lice. O.S. was a rising high school freshman but was reading at a third or fourth grade level.

The relatives were concerned about Mother's homelessness, thought Mother may be using drugs, and needed to enroll the children in school for the coming year but did not have power of attorney to do so. The relatives had tried to contact Mother about enrolling the children in school but could not get ahold of her. Fleury attempted to contact Mother and left a phone message, but Mother did not return the message. Fleury swore out an affidavit to support child in need of care (CINC) petitions by the State.

On August 12, 2016, the State filed CINC petitions alleging that O.S. and N.S. were children in need of care. On the same day, the trial court placed O.S. and N.S. in

2

DCF custody; the children's placements were with their paternal relatives, continuing their existing living arrangements. The trial court also appointed a guardian ad litem for both children. After the children were placed in DCF custody on August 12, 2016, Mother contacted Fleury. Fleury told Mother that the children were in DCF custody; Mother got upset and threatened to come take her kids from custody.

On December 19, 2016, the trial court adjudicated O.S. and N.S. as children in need of care because they were "without adequate parental care, control or subsistence and the condition is not due solely to the lack of financial means of the child[ren]'s parents." The trial court ordered that O.S. and N.S. remain in DCF custody but ordered the development of a reintegration plan for Mother. The trial court also ordered that Mother may have supervised visitation contingent on negative drug tests. The children remained in their placements with N.S. at their paternal grandparents' home and O.S. at their paternal great uncle's home.

On January 24, 2017, the trial court adopted a reintegration plan for Mother. The plan required Mother to obtain safe and stable housing and provide proof of rent and utility payment to KVC Behavioral Healthcare (KVC); to provide monthly income verification and submit a budget; to participate in mental health services; to submit to random urinalysis tests (UAs) and test negative; to abide by all court orders; to apprise KVC of all changes in contact information; and to actively participate in court-ordered visitation, contingent on negative UAs. On March 28, 2017, the trial court ordered Mother to engage in family therapy services with O.S. and N.S., "to begin when considered appropriate by KVC."

On October 24, 2017, the State requested appointment of permanent custodians for O.S. and N.S. The State alleged that Mother was unfit and would continue to be unfit in the foreseeable future for several reasons. The reasons included:

"Emotional illness, mental illness, mental deficiency or physical disability of the parent, of such duration or nature as to render the parent unlikely to care for the ongoing physical, mental, and emotional needs of the child;

. . . .

"excessive use of intoxicating liquors or narcotic or dangerous drugs;

. . . .

"lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child;

"failure to assure care of the child in the parental home when able to do so;

"failure to maintain regular visitation, contact [or] communication with the child or with the custodian of the child;

"failure to carry out a reasonable plan approved by the court directed toward the integration of the child into the parental home."

The State's petition alleged that O.S. had "no desire to reintegrate with his mother due to past circumstances." The State also cited Mother's ongoing drug use. Further, the State alleged that Mother continually missed appointments with KVC.

The court held a bifurcated trial on the State's motion. The first portion was held on December 20, 2017. Mother appeared in person with her attorney. Fleury, paternal great uncle, paternal grandmother, and Dustin Shandy, O.S. and N.S.'s case manager at KVC, testified on behalf of the State. Fleury testified about the allegations in her affidavit and Mother's threat to pick up the children from DCF custody on August 12, 2016.

Paternal great uncle testified that when Mother dropped off O.S. and N.S. in early July 2016, there was no understanding that it would be a long-term arrangement; the paternal relatives thought they would be caring for the children for a weekend. When the weekend ended, the paternal relatives could not get ahold of Mother until Mother came for N.S.'s birthday in mid-July, took the children for a few days, then returned the children to the paternal relatives before leaving again. Once Mother dropped off the children after N.S.'s birthday, the paternal relatives again could not get ahold of her. They

4

became concerned because the deadline to enroll the children in school was approaching and they did not have legal authority to enroll the children. Paternal great uncle testified that the paternal relatives met with Mother's mother and stepfather and together agreed to contact DCF to enroll the children in school since Mother was unreachable.

Paternal great uncle further testified that when the children arrived at the paternal relatives' homes, they each had only one change of clothes. O.S. had one pair of tennis shoes, and N.S. had a pair of flip-flops. O.S., who was a rising freshman, was only reading at a third or fourth grade level. Paternal great uncle testified that during the 18 months that he had custody of O.S., he worked with O.S. on reading skills for an hour every night, and by the time of trial O.S. was reading at an eighth grade level. He testified that when he first got custody of O.S., his grades were poor: he was receiving Ds and his best grade was a B in gym. After staying with paternal great uncle, by the time of trial, his grades were mostly As and Bs with one C. Paternal great uncle testified that he was discussing college possibilities with O.S., and O.S. was excited at the prospect of going to college and had a scholarship lined up. Paternal great uncle testified that O.S. had seen Mother between 12-15 times since August 2016, and that O.S. declined to speak to Mother when she called. Paternal great uncle also testified that O.S. expressed a desire to no longer have Mother in his life, and that when O.S. was required to see Mother for reintegration plan tasks, he came away angry and frustrated.

Paternal grandmother testified that when Mother dropped the children off with the paternal relatives in 2016, Mother was homeless. She testified that when N.S. arrived at the paternal relatives' homes, she had a severe case of head lice. Paternal grandmother said that she suspected for a "long time" that Mother was using drugs starting several years before the DCF case. She based this suspicion on Mother's erratic behavior and appearance.

Paternal grandmother also testified that N.S. felt stable and comfortable in the paternal grandparents' home. She testified that N.S. was very close to her 17-year-old half-sister who also lives in the home. She testified that Mother would show up unannounced at the paternal relatives' homes and leave items for the children. She testified that N.S. would speak to her Mother on the phone when she called approximately once a week, but that she was not very engaged in the conversations.

Dustin Shandy, the children's case manager, testified that the children's KVC file was an accurate reflection of the services provided to the family; Mother stipulated to the file as a business record. Shandy addressed Mother's progress on the reintegration plan tasks.

With respect to finding safe and stable housing, Shandy testified that Mother currently lived with her parents in Missouri and had done so since March 2017. She testified that between August 2016 and March 2017, Mother was homeless and "bounced" between different places without having a home of her own. She testified that Mother had provided proof of a renter's education program for Douglas County, Kansas, but had not yet secured housing.

With respect to developing a monthly income and completing a budget, Shandy testified that Mother had a seasonal job from fall 2016 to February 2017, and began working a part-time job (27 to 32 hours a week) in February 2017. She testified that Mother was still working at the part-time job as of the time of trial. She testified that the budget Mother submitted showed that she did not have the resources to support the children without state assistance.

With respect to mental health services, Shandy testified that Mother did an intake at the Guidance Center but was unable to continue services because she was no longer a

6

Kansas resident. Shandy testified that at the time of trial, Mother was not receiving any mental health services.

With respect to drug testing, Shandy explained that Mother often tested positive for methamphetamine and/or amphetamines and frequently failed to show up to test when required. Mother no-showed three UAs in December 2016. She no-showed one UA in January 2017 and tested positive for methamphetamine at two other UAs. In February 2017, Mother tested positive once for amphetamines and once for methamphetamine. In March 2017, Mother no-showed three times and had one negative test with a faint line for meth. In April 2017, Mother tested positive once for meth and amphetamines. She no-showed all her UAs in May 2017. She no-showed all her UAs in June 2017, except for one instance where a court ordered her to go to community corrections on June 27th, and she tested positive for methamphetamine. She no-showed four times in July 2017. She no-showed three times in August 2017. In September 2017, she no-showed twice and had two tests that were negative but had faint lines for methamphetamine. She no-showed all her UAs in October 2017. She no-showed twice in November 2017. On December 14th, the week before the trial, Shandy performed a mouth swab on Mother, and it was positive for methamphetamine and amphetamines. Shandy testified that Mother provided no verification of drug treatment at any point in the case. She testified that KVC's policies required Mother to have two consecutive negative UAs in order to visit the children. Shandy further testified that KVC staff offered to help Mother "work it out some way" if she could not make it to Kansas for a UA because of transportation issues but that Mother had to contact KVC in order for them to help. She said that Mother only contacted her once asking for an alternative arrangement for a scheduled UA.

Shandy also described Mother's difficulty adhering to the rules and requirements of her reintegration plan. She testified that Mother missed the most recent case plan meeting in August 2017. She testified that on August 16, 2017, Mother showed up at the KVC office and demanded visits. After being told that the visits had to be supervised,

Mother left the office and picked up N.S. from her placement for an unauthorized visit. She testified that in December 2016, Mother left a voicemail for O.S. where she yelled and cussed at him; O.S. forwarded this voicemail to the case manager at the time. She testified that Mother had no authorized visits with the children from the beginning of the case until November 2017, due in large part to the requirement that Mother produce two consecutive clean UAs before visitation. Shandy also testified that Mother missed the first of four scheduled family therapy sessions and was 45 minutes late for the second one. She testified that she had to stop the last family therapy session on December 14, 2017, because Mother and O.S. were yelling at each other.

Shandy testified that she did not believe Mother was capable of parenting O.S., and that Mother could parent N.S. only if she stopped taking methamphetamine.

The second portion of the bifurcated trial was held January 17, 2018. Mother again appeared in person with her attorney. During this hearing, O.S.'s therapist, Walter Louis, testified for the State, and Mother and maternal grandmother testified on Mother's behalf.

Maternal grandmother testified that Mother lived with her in Missouri full time from November 2016 until the time of trial. She testified that prior to November 2016, Mother would sometimes stay at maternal grandmother's home, but would "just take off" and maternal grandmother would not know where she went. She testified that Mother lived with the children continuously from the time they were born until July 2016. She testified that Mother was attentive to the children's educational, medical, and other needs. She attributed O.S.'s anger and frustration with Mother to the limited contact he had with her over the past 18 months. She testified that she did not know Mother was using methamphetamine until she heard Shandy's testimony during the first part of the hearing.

Mother testified that after the children's father, her common-law husband, died in 2013, she struggled emotionally and financially. She testified that despite this, she

remained committed to caring for the children and fulfilling their needs. She testified that when O.S. was in the eighth grade, he was reading at grade level, but said that his reading level dropped every summer and that the stress and trauma of moving during the summer of 2016 contributed to his low reading level at the start of high school. She said that when she dropped the children off with their paternal relatives in July 2016, she asked the relatives to watch the children for two months so that she could find a job and secure a place to live. She testified that she always had a great relationship with her children. She attributed the tension between herself and the children to the children's difficulty accepting their Mother's new relationships after their father's death and the prolonged separation from their Mother during the case. She attributed her numerous no-show UAs to transportation problems like car breakdowns and an inability to get a ride from her mother or stepfather. She testified that she applied for and was approved for low income housing in Lawrence, Kansas, but had not yet moved in. She said that she failed to complete many of her reintegration plan tasks because KVC failed to communicate with her and it was hard to get to KVC from her mother's house in Missouri. She said that the reason she missed KVC meetings and appointments was because KVC failed to contact her.

She admitted to using methamphetamine and testing positive on UAs but claimed she did not start doing methamphetamine until January 2017. Then, she said that she had actually done methamphetamine in August 2016 after the children were placed in DCF custody. She claimed that some of the times when she tested positive for meth, she had not actually done meth but was merely exposed to it at her job. She admitted to using methamphetamine when she tested positive the week before trial. She said she only used methamphetamine because she was separated from her children, and that she was not addicted and did not have a problem. She said "I can go without it. I can pick it up, I can leave it. I don't give a fu—excuse my French. I don't give two effs about. It does not matter to me. I did not start it until my children left me." She said she did understand that her visits were contingent on negative UAs.

9

Mother also admitted to leaving O.S. the voicemail where she swore at him and said she would "whoop his ass" but said she did not mean she would physically hurt him. She said that she meant she would punish him for being disrespectful but said she never physically hurt her children.

During closing, the State emphasized that they were not trying to entirely sever Mother's contact with the children but instead wanted to appoint permanent custodians. The State noted, however, that termination of Mother's parental rights may have also been appropriate given the facts of the case. The State emphasized Mother's drug use as an ongoing problem and highlighted the fact that Mother could have had significantly more contact with the children if she had produced negative UAs, but she failed to do so. The State said Mother had failed to do most of her reintegration tasks.

During Mother's closing, she argued that her drug use was a form of self-medication following the loss of her husband and separation from her children. She highlighted her bond with the children, particularly N.S. She requested that the court not grant a permanent custodianship or, in the alternative, if the court did grant a permanent custodianship, that the court reserve jurisdiction so that Mother's parental rights were not terminated.

In his closing, the children's guardian ad litem requested that the court grant paternal great uncle and paternal grandmother permanent custodianship of the children.

In addition to the testimony at trial, the trial court took judicial notice of the children's KVC files. The trial court stated it was concluding the evidence portion of the trial after Mother testified. After closing statements, the trial court took the matter under advisement.

10

On May 14, 2018, the trial court entered an order finding clear and convincing evidence that Mother was unfit. The trial court noted the presumption that Mother was unfit under K.S.A. 2017 Supp. 38-2271 because O.S. and N.S. were in an out-of-home placement for more than a year and Mother substantially neglected or willfully refused to carry out a reasonable reintegration plan. The trial court also found that additional factors of unfitness under K.S.A. 2017 Supp. 38-2269 applied. These factors included:

> "1. Failure of reasonable efforts made by appropriate public and private agencies to rehabilitate the family; 2. Failure to assure care of the children in the parental home when able to do so; 3. Failure to carry out a reasonable plan approved by the court directed toward the integration of the children into a parental home."

As a result, the trial court ordered the appointment of permanent custodians for O.S. and N.S. The trial court did not, however, terminate Mother's parental rights.

Mother timely appealed.

*Were the Trial Court's Findings of Parental Unfitness Supported by Clear and Convincing Evidence?*

> "When [a] child has been adjudicated to be a child in need of care, the court may terminate parental rights or appoint a permanent custodian when the court finds by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." K.S.A. 2017 Supp. 38-2269(a).

K.S.A. 2017 Supp. 38-2269(b) and (c) provide a nonexhaustive list of factors courts may consider to determine whether a parent is unfit. Any one of the factors listed in K.S.A. 2017 Supp. 38-2269(b) or (c) can sufficiently establish grounds for termination of parental rights. K.S.A. 2017 Supp. 38-2269(f).

11

Additionally, under K.S.A. 2017 Supp. 38-2271(a)(5) there is a legal presumption of parental unfitness when the State establishes by clear and convincing evidence that the child has been in an out-of-home placement under court order for a cumulative period of at least one year and "the parent has substantially neglected or willfully refused to carry out" a reasonable court-approved reintegration plan. When this presumption applies, "[t]he burden of proof is on the parent to rebut the presumption of unfitness by a preponderance of the evidence." K.S.A. 2017 Supp. 38-2271(b).

When this court reviews a trial court's determination of parental unfitness and unlikelihood of change, it reviews the record in the light most favorable to the prevailing party and determines whether a rational fact-finder could have found the decision "highly probable, *i.e.*, [supported] by clear and convincing evidence." *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008). When conducting clear and convincing evidence review, this court does not "weigh conflicting evidence, pass on credibility of witnesses, or redetermine questions of fact." 286 Kan. at 705. Clear and convincing evidence "is an intermediate standard of proof between a preponderance of the evidence and beyond a reasonable doubt." 286 Kan. at 691.

Here, the trial court found that a presumption of unfitness applied because O.S. and N.S. were in an out-of-home placement for more than a year and Mother had substantially neglected or willfully refused to carry out the reintegration plan. The trial court further found that Mother failed to rebut the presumption by a preponderance of the evidence. Mother conceded that O.S. and N.S. were in an out-of-home placement for at least a year.

The trial court also found that Mother was unfit because the following factors from K.S.A. 2017 Supp. 38-2269(b) and (c) applied:

12

"1. Failure of reasonable efforts made by appropriate public and private agencies to rehabilitate the family [K.S.A. 2017 Supp. 38-2269(b)(7)]; 2. Failure to assure care of the children in the parental home when able to do so [K.S.A. 2017 Supp. 38-2269(c)(1)]; 3. Failure to carry out a reasonable plan approved by the court directed toward the integration of the children into a parental home [K.S.A. 2017 Supp. 38-2269(c)(3)]."

On appeal, Mother contests two of the three factors that the trial court found weighed in favor of a finding of unfitness. First, she argues that there was insufficient evidence to support the trial court's finding that reasonable agency efforts to rehabilitate the family had failed. Second, she argues that "it defies logic" to weigh "failure to assure care of the child in the parental home when able to do so" against her because she was homeless. Mother does not support either of these arguments with any authority.

Mother also argues that there was insufficient evidence to support the presumption of unfitness, and that if the presumption was properly applied, she nevertheless satisfied her burden to refute it. Last, she argues that there was no evidence that she would continue to be an unfit parent in the foreseeable future.

This opinion addresses each of Mother's arguments in turn.

*Failure of reasonable reintegration efforts: K.S.A. 2017 Supp. 38-2269(b)(7)*

As stated above, Mother fails to provide any authority to support her argument on this issue. "A failure to support an argument with pertinent authority or to show why it is sound despite a lack of supporting authority or in the face of contrary authority is akin to failing to brief the issue." *Friedman v. Kansas State Bd. of Healing Arts*, 296 Kan. 636, 645, 294 P.3d 287 (2013). Arguments not supported with pertinent authority are thus deemed to be waived and abandoned. 296 Kan. at 645.

13

Mother also fails to support this argument with citations to the record. In fact, her entire argument on this issue is as follows:

> "Use of the 'failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family' to support a finding of unfitness by its very language requires that some sort of 'reasonable efforts' had been made. In the instant case, responsibility for reintegration and visitation was passed from case manager to case manager. Moreover, the record is replete with evidence of Appellant's attempts to contact various workers and remain in touch with her children. If
> As a result, there is insufficient evidence on the record to support this point."

Mother provides no citation to the record in support of her claim that "responsibility for reintegration and visitation was passed from case manager to case manager." She provides no argument as to why the alleged transition from one case manager to another equates to a total lack of reasonable efforts at reintegration, as she suggests. The only facts taken from Mother's statement of the facts that can be construed in support of her arguments on this issue are as follows:

> "10. KVC Case Manager Dustin Shandy testified that Appellant-Natural Mother had attended five (5) supervised visits with the children since Ms. Shandy became involved with the case. Vol. 3, Pg. 110

> "11. KVC Case Manager Shandy further testified that Appellant-Natural Mother had been consistent in her contacts with KVC since Ms. Shandy became involved with the case, had provided proof of employment and that she had regularly attempted to have contact with the children. Vol. 3, Pg. 116; Pg. 130-140"

These two facts hardly equate to a total lack of rehabilitative efforts and a record "replete" with efforts by Mother to contact KVC and her children. "When facts are necessary to an argument, the record must supply these facts and a party relying on those facts must provide an appellate court with a specific citation to the point in the record where the fact can be verified." *Friedman*, 296 Kan. at 643. Mother has failed to supply

14

the facts necessary to establish her argument that she received no reasonable rehabilitative services.

The State correctly argues the evidence shows that Mother did receive reasonable efforts to rehabilitate the family but failed to take advantage of them. Mother was eligible for supervised visitation at any point after the reintegration plan was adopted in January 2017, so long as she produced two consecutive negative UAs. Nevertheless, Mother did not have a supervised visit with the children until November 2017. As a result, Mother only had five authorized visits with the children between January 2017 and the beginning of the trial in December 2017. Mother's case manager also scheduled a meeting with Mother to review the case plan in August 2017, but Mother did not show up to the appointment. Additionally, KVC provided family therapy appointments for Mother and the children; Mother did not show up for the first of the four sessions and was 45 minutes late to the second. Shandy also testified that she offered to help Mother figure out a way to make UA appointments despite living in Missouri, but that Mother had to contact KVC for them to help her. Shandy testified that Mother only took her up on this offer one time.

Applying the correct clear and convincing standard of review and reviewing all of the evidence in the light most favorable to the State, this court affirms the trial court's finding that this factor weighed in favor of a finding of unfitness. Contrary to Mother's claims on appeal, the record establishes that KVC offered Mother reasonable rehabilitative efforts.

*Failure to assure care of the children in the parental home: K.S.A. 2017 Supp. 38-2269(c)(1)*

Much as with the prior factor, Mother failed to support her argument on this issue with any authority or citations to the record. Indeed, the entirety of Mother's argument on this issue is as follows:

15

"Similarly, the 'failure to assure care of the child in the parental home when able to do so' is by its own language reliant on the parent having a home in which to assure such care. The evidence shows that, in the wake of her husband's death, housing insecurity was the precise reason the Appellant-Natural Mother left the minors with family to begin with. It defies logic to base the removal of children on both mother's homelessness *and* her failure to assure care of her children in her home when she was able."

Once again, Mother's failure to support her argument with either legal authority or citations to the record likely results in waiver of this argument. See *Friedman*, 296 Kan. at 643, 645.

The State argues that the record here, when construed in the light most favorable to the State, shows that it was possible that Mother could have had a place to stay but chose not to. Maternal grandmother testified that Mother and the children lived with her in her Missouri home from June 2014 to July 2015. She testified that Mother and the children moved out when maternal grandmother and maternal stepgrandfather had to move in with maternal stepgrandfather's mother in a retirement community that did not allow children. Maternal grandmother did not testify as to when, if ever, she stopped residing in the retirement community. She did testify that Mother began to live with her full time again in November 2016 and stayed with her sporadically before November 2016. Mother testified that after she moved out of maternal grandmother's house, she moved in with a boyfriend. She said that she dropped the children off with the paternal relatives after she was asked to leave where she had been living with her boyfriend in the summer of 2016.

In this record, it is unclear whether Mother could have lived with the children at maternal grandmother's house from July to August 2016 when she dropped the children off with paternal relatives. Even so, there is clear and convincing evidence of Mother's unfitness.

16

Notably, Mother did not address on appeal the third factor cited by the court as grounds for parental unfitness: "Failure to carry out a reasonable plan approved by the court directed toward the integration of the children into a parental home." See K.S.A. 2017 Supp. 38-2269(c)(3). Issues not briefed are deemed abandoned. *In re Marriage of Williams*, 307 Kan. 960, 977, 417 P.3d 1033 (2018). Accordingly, this court could affirm the trial court's decision on the basis of this factor alone, as Mother failed to contest the trial court's conclusion with respect to this factor. See K.S.A. 2017 Supp. 38-2269(f) (any one of the factors listed in K.S.A. 2017 Supp. 38-2269[b] or [c] can sufficiently establish grounds for termination of parental rights).

*Rebuttable presumption of unfitness: K.S.A. 38-2271(a)(5)*

K.S.A. 2017 Supp. 38-2271(a)(5) sets forth a legal presumption of parental unfitness when the State establishes by clear and convincing evidence that the child has been in an out-of-home placement under court order for a cumulative period of at least one year and "the parent has substantially neglected or willfully refused to carry out" a reasonable court-approved reintegration plan. When this presumption applies, "[t]he burden of proof is on the parent to rebut the presumption of unfitness by a preponderance of the evidence." K.S.A. 2017 Supp. 38-2271(b).

Mother concedes that the children were in an out-of-home placement for at least a year. She argues, however, that the record does not support the trial court's finding that she substantially neglected or willfully refused to carry out the reintegration plan. As explained earlier, Mother largely failed to carry out her reintegration plan.

The reintegration plan required Mother to submit to random UAs and test negative. Mother frequently no-showed for required UAs and frequently tested positive for methamphetamine and/or amphetamines, including testing positive for both

17

methamphetamine and amphetamine a week before trial. The plan required Mother to actively participate in court-ordered visitation with the children. Mother did not have any authorized visitation with the children from January 2017 until November 2017. Mother also was ineligible for visitation for large stretches of time because of her UA no-shows and positive tests. The reintegration plan required Mother to participate in mental health services. Mother did a mental health intake in Kansas but then moved to Missouri; KVC was unable to arrange mental health services for Mother in Missouri. Mother failed to engage in mental health services in Missouri. The record contains clear and convincing evidence for the trial court's finding that Mother substantially neglected or willfully refused to carry out the reintegration plan.

Mother also argues that "even were the presumption to be applied," she "has more than met the burden of proof in refuting it." She provides no authority to support her argument, and she does not even provide the burden of proof she has supposedly satisfied. A point raised incidentally in a brief and not argued therein is deemed waived or abandoned. *Russell v. May*, 306 Kan. 1058, 1089, 400 P.3d 647 (2017).

*Unfitness in the foreseeable future:  K.S.A. 2017 Supp. 38-2269(a)*

Finally, Mother argues that the trial court's decision must be overturned because there is no evidence that she will continue to be an unfit parent in the foreseeable future. Under K.S.A. 2017 Supp. 38-2269(a), a trial court must find both that a parent is unfit and that their "conduct or condition is unlikely to change in the foreseeable future" in order to appoint a permanent custodian. Courts consider the "foreseeable future" from the perspective of a child because children's perceptions of time differ from those of adults. *In re M.H.*, 50 Kan. App. 2d 1162, 1170, 337 P.3d 711 (2014). Children have a right to permanency within a time frame that is reasonable for them. 50 Kan. App. 2d at 1170.

18

Mother largely bases her argument here on her claim that she successfully completed a substance abuse treatment program. As the State correctly points out, Mother's certificate of program completion was not before the trial court when it ruled on the State's motion to appoint permanent custodians. The trial court announced it concluded receiving evidence on the issue at the end of the second part of the hearing on January 17, 2018. According to her certificate, Mother did not even begin drug treatment until two months after the second half of the hearing. Further, these results were not submitted to the trial court until June 5, 2018, a month after the court's ruling appointing permanent custodians for O.S. and N.S.

Mother compares this case to *In re K.R.*, where a panel of this court found that no evidence supported "the crucial element that Mother's unfitness 'is unlikely to change in the foreseeable future.'" *In re K.R.*, 43 Kan. App. 2d 891, 902, 233 P.3d 746 (2010). Mother is incorrect. In *In re K.R.*, this court noted "limited testimony" below on the issue of Mother's future unfitness and, to the contrary, testimony indicating "that as of the termination hearing, there had been substantial progress toward all conditions of reintegration." 43 Kan. App. 2d at 902. This comparison is unconvincing.

Here, Shandy testified at the trial about Mother's failure to complete reintegration plan tasks. She testified that Mother tested positive for drugs the week before the trial. She testified that Mother was not enrolled in any mental health services. Though the reintegration plan required Mother to engage in supervised visitation with the children, Mother did not have any supervised visitation with the children at all from January 2017 until November 2017; Mother only began to engage in supervised visitation with the children a month before the trial. Moreover, by the time of the trial, the children had been out of Mother's custody for 16 months (from August 2016 to December 2017). Mother's case plan had been in effect for a full year.

A trial court may properly consider a parent's past conduct as an indication of future behavior. *In re M.T.S.*, No. 112,776, 2015 WL 2343435, at *8 (Kan. App. 2015) (unpublished opinion), *rev. denied* 302 Kan. 1010 (2015). A reasonable fact-finder could conclude from the evidence at trial that Mother had failed to make much, if any, progress with respect to her drug use or mental health during the time her case was open. The same reasonable fact-finder could also conclude that since Mother made no or little progress with respect to mental health or drug use during this time, she was therefore unlikely to make progress in the foreseeable future. Accordingly, the record contains clear and convincing evidence to support the trial court's conclusion that Mother would continue to remain unfit for the foreseeable future. Accordingly, we affirm.

Affirmed.